SHEANON, Executor, Respondent, vs. THE PACIFIC MUTUAL LIFE INSURANCE COMPANY, Appellant.

*November 1 — December 6, 1892.*

*Accident insurance: Waiver of proofs of loss: Agency: Evidence: Release signed through excusable mistake or negligence.*

1. An accident policy provided that the company would pay to the assured $3,000 if he lost both feet within ninety days after the accident causing such loss, or an indemnity of $15 per week, not exceeding thirty weeks, for loss of time resulting from accidental injuries. It was a condition that proofs of loss be furnished within seven months. The assured was accidentally shot in the spine, and both legs became paralyzed. Within ninety days thereafter the company's agent informed it of the facts, stating that the paralysis was permanent and that to all practical purposes the assured had lost the entire limbs; but the company denied liability for the full amount on the ground that the legs had not been amputated. The agent also, with a view to defeating a claim for the full sum, obtained the signature of the assured to a proof of loss or claim for weekly indemnity. At the request of the company the assured submitted to several examinations by its physicians, and, after the time for furnishing proofs had expired, he procured and sent to the company, at its request, the statement of his family physician showing his condition. *Held,* that there was a waiver of the formal proofs of a loss entitling the assured to the full sum.

2. The assured having been injured and rendered utterly helpless in a distant country, with no friend or relative near him except his brother, and it being important to close up the business relating to the insurance before he was taken to his home, the agency of the brother to act for him in the matter might be implied from the circumstances.

3. One R. was in the office of the general agent and manager of the Company at the place where the assured was, and, as the manager

Sheanon vs. The Pacific Mutual Life Ins. Co.

testified, had charge of the matter of the claim of the assured. R. wrote to the company with reference to the matter, signing the name of the manager and adding the initial "R.". The company replied to the manager, and R. received the letter and communicated the denial of liability for the full amount, therein contained, to the brother of the assured. *Held*, that the authority of R. to act for the company was sufficiently shown.

4. The statement of the family physician of the assured sent by him to the company at its request, after the time for furnishing proofs of loss had expired, was admissible to show a waiver of the requirement of proofs of loss.

5. The agent of the company having obtained the signature of the assured to a claim for the weekly indemnity, such indemnity, amounting to $450, was afterwards paid to him, and he signed a writing purporting to release the company from any further liability. *Held*, that if such release was signed by the assured through excusable mistake or negligence, he was not bound by it, although no false representations as to its contents were made to him.

6. Evidence as to the condition of the assured after the expiration of ninety days from the date of the injury, was material upon the question whether he signed said release through excusable mistake or negligence.

7. With the release was sent to the agent of the company a letter, written in the name of the assured at the request of his brother, which said: "Is there any possibility of the company allowing me for the loss of my legs and feet? I think I am entitled to the full amount, as I have no use of my feet whatever. What do you think of it?" In reply the agent wrote that he thought the company would not be disposed to do more, but he would forward to it the letter of the assured, and would be very happy if it would admit a further claim. *Held*, that these letters were admissible upon the question whether effect should be given to the release of the full claim.

8. The jury having found that the assured did not sign the release with full knowledge of its contents, and did not elect to take the $450 paid to him as indemnity in lieu of his claim for the full amount of the policy, and the $450 being credited upon the recovery of the full amount, the company cannot complain that said sum was not tendered or paid back before the commencement of the action, as a condition of recovery.

APPEAL from the Circuit Court for *Dane* County.

Action upon an accident insurance policy for $3,000, issued to the plaintiff's testator; by which he was insured for

the term of twelve months, to be paid, etc., after due no-
tice and satisfactory proof (1) "that the insured, during
the continuance of the policy, has sustained such violent
and accidental injuries as shall be externally visible on his
person, and which alone shall have caused his death within
ninety days from the date of such accident, or, if this pol-
icy be issued for both death and indemnity [as was the
case], the company will pay the insured the principal sum
(2) if he, within such ninety days and from such accidental
means, suffers the loss of the entire sight of both eyes, or
the loss of two entire hands or two entire feet, or one en-
tire hand and one entire foot, and survives said ninety days;
or (3) the sum of $15 per week, not exceeding thirty con-
secutive weeks, for the immediate, continuous, and total
loss of such business time as may result necessarily from
such injuries." One of the conditions of the policy was
that, "unless affirmative proof of death, loss of sight or
limb, or duration of disability be furnished within seven
months, . . . all claims on the policy shall be forfeited
to the company."

The complaint of the assured (the action having been
commenced in his lifetime) alleged, and the proof showed,
that at Burke, Idaho T., November 12, 1888, without fault
or negligence on his part, a ball, shot from one of the weap-
ons of two persons quarreling, struck a little to the right
of the middle line of the spine, about the level of the lower
dorsal *vertebra*, penetrating it, and caused him immediately
to fall upon the ground helpless and paralyzed, so that he
lost the use of all the lower portion of his body, both of his
limbs and both of his feet, leaving upon his body a visible
and external mark of his injury; and he thereby lost both
entire feet, and was thereby and thereafter permanently
and forever deprived of the use of both of his feet, so that
they would not ever be able in any way to perform their
proper functions or any function whatever, although neither

of said limbs or said feet had been amputated. That on the
13th of November, 1888, he caused notice thereof to be
given to one Davis, the agent of the defendant residing at
the place where said accident occurred.    That within two
weeks thereafter the defendant sent one Dr. Harvey, as its
physician and medical examiner, to examine the assured,
which he did, and he was there fully advised of the condi-
tion and extent of the injuries which he had so suffered
solely by reason of said accident.    That about the 23d of
December, 1888, the assured was removed from Burke to
Spokane Falls, Wash. T., and he there sent notice of said
injuries and of said accident to the general manager of the
defendant company, living at that place, who sent another
physician, who, shortly after the 23d day of December, 1888,
visited the assured, and examined him carefully, and was
made fully aware of the extent of his injury and its nature,
and of the manner in which the accident occurred; and he
then and there well knew that the accident had caused such
condition of the plaintiff's lower limbs and feet that he
would not improve, and that he had suffered, by reason of
said accident, the loss of both of his feet and lower limbs, per-
manently and forever.    That he remained at the place afore-
said thirty days, and during that time demanded of the
defendant the payment of the said sum of $3,000 from it,
as the sum to which he was entitled under the said policy;
but that the defendant refused to pay him the said sum,
solely on the ground that he had not suffered the loss of
both or either of his said feet, in that they had not been
amputated.    That the company was fully apprised of the
facts and circumstances of said injury, and refused to pay
him said sum, except the sum of $450, paid him in the month
of September, 1889.    The complaint alleged general per-
formance on the part of the assured of all and singular the
conditions of the said policy.

Upon demurrer to the complaint it was held that the as-

sured had suffered the loss of two entire feet, within the
meaning of the policy.  *Sheanon v. Pacific M. L. Ins. Co.*
77 Wis. 618.   The defense, in substance, was a denial of loss
permanently of both the feet of the assured, or notice
thereof, and a denial that proofs of such loss were furnished
as required by the policy; that the assured, January 21, 1889,
made and presented his claim under the policy by reason of
his injury to the weekly indemnity of $15 per week for
thirty weeks, amounting to $450, which the defendant paid
him September 24, 1889, in full satisfaction and discharge
of all losses and liabilities growing out of the injury in ques-
tion, which was so received and accepted, whether the re-
sult of the injuries might be fatal or otherwise.

Evidence was given to the effect that an agent of the de-
fendant at Burke was immediately notified of the injury,
and that he visited the assured, and had the physician of
the company call and examine him.  The case was reported
to the company on the 18th of the same month by the
agents at Burke.   About the middle of December the as-
sured was taken by his brother, *Robert*, who was with him,
to Spokane Falls, to the Mercy Hospital, where he staid
about a month.   While there, his brother, *Robert*, took
care of him, and, having been informed that the company
had a general agent and office at Spokane, he called at the
place as he had been directed, and asked the man that was
there if that was the *Pacific Mutual Life Insurance Com-
pany*, to which he responded it was, and asked what he
could do for him.   The company's sign was up on the out-
side of the building.   That he told him he had his brother
in the hospital; he was shot.   That he was insured in the
company.  That he wanted to see if it was not going to pay.
That he wanted to go home.   "He said he could not pay,
but would write to the company.  I told him he had better
telegraph; writing would take too long.  So he telegraphed,
as I supposed."  That the only reason he had for supposing

the man at Spokane Falls to be Donald Ross was that he told him all letters he sent there to address to Donald Ross, Spokane Falls. Defendant's counsel asked that the testimony concerning the interviews with this man be stricken out, but this was refused. Witness further testified that he told the man in the bank he had his brother up in the hospital, and wanted him to write to the company, or dispatch to them, to see if they would settle the claim. That they afterwards heard from the company, through this gentleman, whom he thought was Donald Ross, and he told them at the hospital he had a letter from the company, and that, unless the assured died or his limbs were taken off in ninety days, they would not pay the full amount. That he went to see him again, and this man said he would come up and see the assured, and get up a proof; and he did come, and he made out a paper of some kind, which the assured signed. That the assured did not read it, nor was it read to him. This man Ross took the paper away with him. That he asked certain questions of his brother; what doctor attended him; told *Robert* he had notified the company and got a letter from them, and read the letter to *Robert*. That the company would not pay the assured unless his limbs were taken off within ninety days, or the accident caused his death. That Ross told them where there was a doctor; to get him, and tell him that he (Ross) sent him; and he went and saw the doctor, who came and examined him, and said the assured would not recover the use of his limbs. That neither *Robert* nor the assured requested that the paper in question should be gotten up. That the assured answered all the questions that were asked by the gentleman who made it out. That their doctor's name was McLean, and he answered all questions put by the doctor. The same night this paper was made the assured and his brother started for Ridgeway, Wis. The assured was never able to walk or to use his feet any of the

time until his death, which occurred July 6, 1890, and was not any better between the time he was hurt and the time he died. It was admitted that no part of the policy had been paid except $450.

It appeared that while the assured was in the hospital at Spokane Falls, January 16, 1889, the man Ross telegraphed to the company that the assured was shot November 12th, in the spine, "causing permanent paralysis of legs. Doctors say will ultimately die. Does limb clause cover permanent paralysis? Wants to return home east now. Will settle for thirty weeks." That the secretary of the company on the same day answered: "Clause does not cover. Must have full proofs. See letter." On the same day Ross wrote to the company, quoting his telegram to it, in which he gave the particulars of the injury, saying: "Doctor attending him says there may be three ways in which it is done [paralysis produced]: There may be a portion of the *vertebra* pressing on the spinal cord, or the bullet may have lodged against it, producing paralysis, or it may have cut a portion of the cord. If it is pressure, a cure can be effected by removing the pressure; but an operation is almost sure to result fatally, so the party does not wish to undergo it, at least until he goes home. Doctor says there is a chance he may linger even for years as he is, but the chances are against him. Dr. McLean says that the muscles that control the legs are severed. My reason for telegraphing you as I did was that, if he lives, he will draw indemnity for thirty weeks, as he will be totally disabled for that length of time. There are yet three weeks in which he may die, and come in for a death claim. By settling for thirty weeks, you will shut off such a claim; and there are a good many chances that he may die in that time. If he lives, he will certainly come in for the thirty weeks, so I thought it would be the best policy to have him make up his claim at once, and avoid a possible death

claim by paying what you would have to pay if he lives. . . . I did not know whether the limb clause applied to complete loss of the use of the members. *To all practical purposes he has lost the entire limbs.* Of course, I did not mean that more than the claim should be made up when I said 'settlement,' but that they should be satisfactory to you before it was paid; and my object, as I said before, was *to cut off the possibility of a death claim.* If such a course meets your approval, and your letter mentioned in your telegram does not cover the case, and you wish it attended to in this way without delay, please advise by telegram, as the party is anxious to settle and get home." Before this letter was received, and on the same day of its date, the secretary of the company also wrote to Donald Ross, Esq., manager, saying, among other things: "Your telegram of this date received. We answer as follows: 'Clause does not cover. Must have full proof. See letter.' We were notified of this case on November 18th last by our general agents at Butte City. . . . If claimant is now in your city, and desires to make up proof, we will consider the proposition mentioned in your telegram. If proofs are to be filed at once, they must be complete in every respect. We have written to Dr. Harvey, of Wardner, for his certificate in the case. . . . When proofs are received we will give them immediate attention." Evidence was given showing that Ross told *Robert* he could not pay the $3,000, but would write to the company; that he was the man who made out the paper which his brother signed at Spokane Falls; that he said it would be better to make that paper up there than back here; and that he would come up to the hospital and get it done, and he did so accordingly.

Plaintiff's counsel called for statement made by Dr. Cutler to the company, which defendant's counsel produced, and the proof tended to show that it was furnished about

the 24th or 25th of July, 1889, at the request of the company. It was to the effect, among other things, that he was called to treat the assured in February, 1889, after his return from Washington Territory. "Found his hips and lower extremities paralyzed, as regards both sensation and motion, caused by a gun-shot wound in the spinal column. I administered strychnia and faradic current. A slight degree of improvement occurred, chiefly in the nutrition of the paralyzed muscles. To all practical purposes he has been, and still is, completely paralyzed in all parts supplied by spinal nerves below the eleventh dorsal *vertebra*, and will, as I believe, remain so during his life." This was sent directed to Donald Ross, Spokane Falls, in reply to a request of the company for a certificate from the family physician. Defendant's counsel moved to strike out the statement of Dr. Cutler, but the court retained it.

The claim or proof of loss, so made out and signed by the assured, was witnessed by K. J. L. Ross, accompanied by the certificate of J. J. Finley, attending surgeon, and was, in substance, in the usual form, dated the 21st of January, 1889, and stated that, "in consequence of the accident, the assured sustained immediate, continuous, and total loss of time for the prosecution of any and every kind of business pertaining to his occupation from November 12, 1888, to June 8, 1889," for which he claimed indemnity for thirty weeks at the rate of $15 per week, "which, when paid, shall be in full discharge of all claims which I have or may have on account of the personal injury aforesaid." There was put in evidence a release, signed by the assured, dated September 24, 1889, which purported, in consideration of $450 received from the defendant by the hand of Donald Ross, agent at Spokane Falls, Wash. T., to be a "full satisfaction and final settlement of all claims I have or may have against said company under accident policy No. 55,078 for loss of time from injuries received on the

12th of November, 1888," and purported to relieve the company "from any further liability growing out of said injuries, whether the result be fatal or otherwise." This receipt or release was inclosed in a letter of the same date to Donald Ross, Spokane Falls, written and signed by one Jarvis, at the request of *Robert Sheanon*, in the name of the assured, as follows: "We inclose you receipt, properly signed. Please forward money at once. Is there any possibility of the company allowing me for the loss of my legs and feet? I think I am entitled to the full amount, as I have no use of my feet whatever. What do you think of it?" *Robert Sheanon* testified that the proof for thirty weeks' disability was not read to the assured before he signed it. That there was no statement made by the agent that the assured had settled his claim against the company for $450, either to him or to witness; and that the agent or man Ross did not see James at any other time than when the proof of loss was made out, when he (witness) was present during the entire interview. That the agent did not call for other proofs when they were signed. That the receipt in question came in a letter from Donald Ross, manager, to James Sheanon, in which he stated: "I am in receipt of draft from company for $435, being the amount of your claim, less $15, the amount of last instalment due on premium. I inclose you a receipt to be signed and dated as indicated, and to be returned to me, when I shall take great pleasure in forwarding the draft." Witness further stated that the assured did not read it; that he took it upstairs and had him sign it; that the assured did not examine the receipt; did nothing with it except sign his name, while lying in bed on his back, when it was at once taken away. In reply to the letter inclosing receipt, it was shown that a letter came to James Sheanon, September 24, 1889, inclosing the $435 and receipt for $15, balance of premium, saying: "In regard to the company

allowing the full limb claim, will say I feel sorry that it has not been allowed, although I think it would be of no use to write them further on the subject, as I wrote them fully at the time the claim was made out, and I feel assured, now that they have passed on the claim and sent the money, that they would not be disposed to do more. However, I will forward your letter to them, and should be very happy if they would admit a further claim. DONALD Ross, Manager. R." The foregoing letters were objected to, but the court admitted them.

· *Robert Sheanon* testified that he did not read the letter to his brother, inclosing receipt, and that its contents were not communicated to him; that Jarvis and Eugene Dougherty were present when the receipt was signed. The latter testified that the assured did not examine the receipt; did nothing except sign his name while lying in bed on his back. Donald Ross testified in his deposition, on behalf of the defendant, in substance, that he did not know the assured in his lifetime, or anything about him. That some one in his office might have had communications with him with reference to his claim against the defendant. That he had nothing to do with the matter. " K. J. L. Ross, who was in my office, attended to it." That he did not know what proofs of loss, if any, were furnished him by James Sheanon or by any one in his behalf, nor whether indemnity was claimed by reason of any loss alleged to have been suffered from total loss of limbs or feet. That he had nothing to do with the matter. K. J. L. Ross attended to him. He said he (Donald Ross) did not, prior to the expiration of seven months, deny all liability for total loss under the policy, either to *Robert Sheanon* or to the assured, and did not, on behalf of the company, take charge of this case from the beginning, and carry on himself, for it, all communications with the assured, but was general agent at the time; that he did not request the assured to make

personal proof of loss for total disability or for weekly allowance; did not procure a surgeon to examine him. "I understood K. J..L. Ross, who was in my office, had communication with the assured, or his brother, *Robert*, with reference to loss under the policy of insurance;" that "K. J. L. Ross had charge of the matter." The secretary of the company testified in relation to receiving the final proofs September 1, 1889, from the hands of Donald Ross at Spokane Falls, acting as general agent of the corporation, and that this claim was for thirty weeks' disability, and nothing further; that no claim was made by James Sheanon for the loss arising from injuries causing him to lose both lower limbs or both entire feet, and no proofs thereof had ever been filed with the corporation, and the first notice of such claim was contained in the communication received November 18, 1889; that the sum of $450 paid had never been tendered or paid back. After referring to the telegrams and letters that had passed between the company and Donald Ross, he testified that he did not direct Ross to deny liability for total loss, and that "the defendant did not, through me or any officer, prior to the expiration of seven months from the 12th day of November, 1888, deny all liability for loss of limb or total disability, and received no communication from the assured or Ross in reference to the payment of the full amount, *other than stated in the telegram and letter*, except February 25, 1889, we received from Donald Ross proof of loss for weekly indemnity only. Subsequently, at our request, additional information was furnished, and the proof of indemnity claimed completed about September 1, 1889." Dr. Ogden gave testimony on behalf of the defendant, based on the testimony of *Robert Sheanon*, as to the injury, that it would have been possible for James Sheanon to recover, and explained to the jury his views of the case. He said, if there had been a laceration of the spinal cord, he could not have

recovered, but, if the paralysis was due to a simple pressure only, he might, if removed by an operation of a skilful surgeon.

The defendant's counsel, upon the entire evidence, moved the court to direct a verdict for the defendant, which was denied. A special verdict was returned in answer to questions, as directed by the court, as follows: "That the assured, November 12, 1888, received the pistol-shot wound in the back, causing the total paralysis of his lower limbs; and that he, within seven months from that date, furnished the company with affirmative proof that he had sustained such paralysis as would permanently and forever deprive him of the use of both his feet, and that the company denied liability therefor; that the assured signed and delivered to the agent of the company the statement or proof of claim in evidence; that on the 24th of September he signed and caused to be delivered to the defendant company the receipt in question, and the sum of $450 was then paid the assured, no part of which was ever tendered back." And the jury, as to the other questions, found that the assured did not sign the statement of claim or proof, with full knowledge of its contents, nor did he sign the receipt with full knowledge of the contents, and did not know, when he received the $450, that it was for payment in full under the weekly indemnity clause in the policy. The jury found the plaintiff's damages, if entitled to recover, at $3,097.98. Such other facts as are material are stated in the opinion.

From a judgment on the verdict, in favor of the plaintiff, the defendant appeals.

For the appellant there were briefs by *Ogden, Hunter & Bottum,* and oral argument by *L. M. Ogden.* They contended, *inter alia,* that a contractor must stand by his contract, and if he will not read what he signs, he alone is responsible for his omission. *Upton v. Tribilcock,* 91 U. S. 45–50; *Wheaton v. Fay,* 62 N. Y. 275; *Germania F. Ins.*

Sheanon vs. The Pacific Mutual Life Ins. Co.

*Co. v. M. & C. R. Co.* 72 id. 90; *Hill v. S. B. & N. Y. R. Co.* 73 id. 351; *Sanger v. Dun*, 47 Wis. 615; *Fuller v. Madison M. Ins. Co.* 36 id. 599. When a receipt is in the nature of a contract, it falls within the general rule applicable to contracts, and cannot be explained by parol evidence. *Coon v. Knap*, 8 N. Y. 402; *Egleston v. Knickerbacker*, 6 Barb. 458. The contract between the parties was that the money should be received in full satisfaction of the claim, and as such was not open to explanation by parol evidence. *Brown v. Cambridge*, 3 Allen, 474; *Squires v. Amherst*, 145 Mass. 192. The court will not rescind or set aside a contract where there has been no fraud practiced and no device or artifice resorted to by which one of the parties was taken advantage of. *Cummings v. Baars*, 36 Minn. 350; *Pratt v. Castle*, 91 Mich. 484; *Fuller v. Buice*, 80 Ga. 395; *Harris v. Story*, 2 E. D. Smith, 363–7; *Curley v. Harris*, 11 Allen, 112–122. Before the release could be avoided, even on the ground of fraud or mistake, the consideration received must be tendered back. *Kreuzen v. 42d St. R. Co.* 13 N. Y. Supp. 588; *International & G. N. R. Co. v. Brazzil*, 78 Tex. 314; *Norwich U. F. Ins. Soc. v. Girton*, 124 Ind. 217; *Van Trott v. Wiese*, 36 Wis. 439–448; *Pangborn v. Continental Ins. Co.* 67 Mich. 683; *Gould v. Cayuga Co. Nat. Bank*, 86 N. Y. 75; *Hendricks v. Goodrich*, 15 Wis. 679; *Grant v. Law*, 29 id. 99.

*H. W. Chynoweth*, for the respondent.

PINNEY, J. 1. The evidence clearly shows that the injury received by the assured justly and properly entitled him to receive $3,000, according to the terms of the policy, for the entire loss of both feet. As early as the 20th of January after the injury the company had full notice of the facts and circumstances of the case, and were informed by the letter of "Donald Ross, R.," dated the 16th of that month, that the wound the assured had received had caused

permanent paralysis of his legs, and that the doctors said
he would ultimately die; that "to all practical purposes he
has lost the entire limbs;" but the company, through its
secretary, denied liability for loss on that ground, because
his legs, which had become useless appendages, had not
been amputated. This information was conveyed both by
telegram and letter to Donald Ross, manager, and within
a few days thereafter to the assured, or at least to his
brother. It is not necessary to comment on the absurdity
of this position of the company, and it is impossible to con-
tend, as we think, that the company did not deny liability
for the loss sued for, so as to dispense with the necessity
of formal proofs of loss. Besides, K. J. L. Ross, who had
charge of the case, must be regarded, under the circum-
stances of the case, as having acted throughout with the
knowledge and authority of the defendant; had prepared
proofs and procured them to be signed and perfected, show-
ing how the assured had sustained his injury, not, it is
true, to enable him to get the $3,000, to which it was evi-
dent he would be entitled at the expiration of ninety days,
but as a means of defeating his claim to that sum by put-
ting him off with the small sum of $450 instead, as dis-
closed in the letter of the 16th of January to the company.
The conduct of the company thereafter in relation to this
policy seems to have been inspired by the improper sugges-
tions contained in this letter. There is nothing in the tes-
timony to show that the assured, or any one acting for
him, ever offered or proposed any compromise of the claim
in suit. On the contrary, the testimony is all the other
way; and, if the facts were otherwise, it is a significant
circumstance that the evidence of K. J. L. Ross, still resid-
ing at Spokane Falls, was not procured to vindicate the
transaction in question, now insisted on by the defendant
as a bar to the plaintiff's recovery, and to show by way of
rebuttal that there was a fair and deliberate agreement by

which the assured, in consideration of $450, elected and chose to forego his right to $3,000, which, to a moral certainty, would become absolute within about three weeks thereafter. K. J. L. Ross drew up and obtained the signature of the assured to the proof of claim for weekly indemnity for thirty weeks at $15 per week. Besides, after the time for furnishing proofs had expired, and in July, 1889, the assured procured and sent to the company, at its request, the statement of the family physician, Dr. Cutler, showing the condition of the assured, and that there had been no material change in it up to July 24, 1889. Before this, the assured, at the request of agents of the company, had submitted to several examinations by its physicians. The objection that the plaintiff cannot recover for failure to furnish the defendant with proper proofs cannot be maintained. The circuit judge properly directed the jury to find that the company had denied liability for the loss in question.

2. The defendant seeks to avoid the effect of the conversations and acts of the assured's brother, *Robert*, and of K. J. L. Ross, in respect to the policy and claim of the assured. It is said, *first*, that there is no evidence to show that *Robert Sheanon* had any authority or right to act or speak for his brother; and, *second*, that the letters, acts, and declarations of K. J. L. Ross were not admissible in evidence, for want of proof of his authority to act for the company. We cannot regard either position as possessing any merit. An authority on the part of *Robert Sheanon* to act as he did in the premises on behalf of his brother need not be express, but might be implied from the uncontradicted evidence as to the circumstances, and showing the deplorable situation of the assured. He had been stricken down in a strange and distant country, with the prospects of present death or a brief life of suffering, from which death itself would be a relief; and was utterly helpless,

with no relative or friend near him but his brother, caring for and attending on him. The agency of *Robert Sheanon* might well be implied from all the facts and circumstances given in evidence, and the conduct of the parties so far as it appears in evidence. In many cases the existence of an agency may be implied or presumed from the words or conduct of the parties, and this, too, although the creation of an agency was not within their immediate contemplation; but this agency is to be limited in its scope and operation to the reasonable and necessary requirements of the case which called it into being. In connection with the unfortunate condition of the assured, it is to be borne in mind that his brother, *Robert*, designed taking him presently to his home in Wisconsin, and it was considered important to close up the business in relation to the policy before leaving Spokane Falls. Under any other rule, if paralysis of the vocal organs had ensued from his injury, it would have been absolutely impossible for him to have made the least provision for his comfort or safety, however necessary, by or through the authority of a friend or relative attending on him, or to bind himself in relation to business matters of great urgency.

Donald Ross testified that at the time in question he was the general agent of the defendant, and he was spoken of as such, and as its manager. The defendant, it appears, addressed him by letter as " manager." He had an office as such at Spokane Falls, with one or more clerks; and the agent at Burke directed the assured and his brother to call on him with reference to the claim under the policy. What followed has been stated. Suffice it to say that the company recognized the communications signed by K. J. L. Ross by adding " R." to the name of Donald Ross, and replied thereto to " Donald Ross, Manager." K. J. L. Ross was in the office of the manager of the company, acting in relation to the case for it, and got possession of the com-

munications from the company properly, as we must assume, and informed the assured or his brother of the letter denying liability for the loss sued for. It was evident that it was the intention of the company that this denial should be communicated, as it seems it was, to the assured; and the several steps by which it was brought about were competent evidence. Donald Ross does not deny the authority of K. J. L. Ross, but rather affirms it. He testified that " K. J. L. Ross, who was in my office, had communication with the assured or his brother, *Robert*, with reference to loss under the policy of insurance in the suit. He is now in Spokane. K. J. L. Ross had charge of the matter." The objections made to the testimony of *Robert Sheanon* and the telegrams and letters offered, are clearly untenable. The uncontradicted evidence places this matter fairly beyond dispute, and shows that the denial of liability was communicated to the assured, or at least to *Robert Sheanon*, who was acting for him, and came in answer to the telegram he had got Ross to send, to ascertain whether the policy covered a case of total paralysis of the legs. *Robert* testified that he (Ross) read off the letter that the company would not pay the man Sheanon unless his limbs were taken off within ninety days or the accident caused his death.

3. We cannot say that the admission of evidence as to the condition of the assured after the expiration of ninety days from the date of the injury was error prejudicial to the defendant, in view of the fact that the only questions left to the jury related to the signing of the proof of loss and the receipt for the $450 in the following July. This evidence was material to the question whether the assured, or the plaintiff, as his executor, should be held barred by reason of the provisions of these papers, or whether he signed them through excusable mistake or negligence.

4. The statement of Dr. Cutler was properly received

in evidence, to show that the assured was endeavoring to comply with the reasonable request of the company to furnish it evidence of his condition immediately after the usual period for furnishing proofs had expired, and tended to show that the provision of the policy on this subject, in view of the surgical examinations of the assured, and other circumstances, was waived, or would not be insisted on, even if it had not been otherwise dispensed with.

5. The motion of the defendant for a nonsuit was properly denied. There was evidence before the jury when the plaintiff rested sufficient to sustain a verdict in his favor. The evidence is uncontradicted that the total paralysis of the lower limbs and feet of the assured continued until his death in 1890, and that after the injury he never had any use of them, and was not able to stand up again. What the possibilities of the case may have been, as viewed from the time when he received his injury, it is not material to consider. They had been resolved into distressing certainty within the period of ninety days from the date of his injury.

6. The letter which was written by Jarvis at the request of *Robert Sheanon*, who had implied authority to act for the assured in that behalf, over his name, and which was sent with the release signed by him, was a part of the transaction in question, and, in view of the condition of the assured, who could only make his signature while lying on his back in bed, was competent evidence to show that he did not waive his claim for the $3,000 for loss of both feet, and did not understand that he was electing or had elected to take the comparatively insignificant sum of $450 in lieu of it, when his right to the greater sum had already become fixed. It conveyed notice to the defendant accordingly, and was proper and, as we think, important evidence, under the circumstances, upon the question whether any effect ought to be given to the release and stipulation in the

proof of claim. The letter of September 28, 1889, signed "Donald Ross, Manager, R.," was produced by the executor of the assured, and the evidence was sufficient to show that it was written by the manager at Spokane Falls, or by his authority, and so was competent. It is significant that it does not insist on the release as a bar, but discourages the idea of writing to the company for the full sum, on the ground that they had passed on the claim, and sent the $450.

7. The remaining questions relate to the effect to be given to the stipulation in the claim of loss, and to the "release," as it is called, though it is not under seal, and were raised by exceptions to the refusal of the court to direct the jury to find for the defendant, and to instructions given and refused, and to the refusal of the court to grant a new trial. It must strike any reasonable person that the assured, and his brother as well, must have been laboring under some serious mistake or misapprehension, and did not understand or agree that the $450 should be taken in full discharge of the $3,000, to which the assured was beyond reasonable doubt entitled when the so-called "release" was signed. It is reasonably clear that this matter was being managed with great care and caution on the part of the company, to avoid payment of the entire amount of the policy. The assured and his brother seem to have had the utmost confidence in the agent of the company, which his superior knowledge and experience was calculated to inspire. He took it upon himself to manage the matter of the proof of claim, and prepared it of his own volition, and sent the release, in which much was said about loss of time, and very little that would relate to the claim for loss of feet. The assured was in a deplorable physical condition, and in the mental perturbation which would naturally attend a great calamity soon to prove fatal. Nothing had occurred to warn him of any sinister plan to get him to

take $450 for a really valid claim of $3,000. His mind had never been directed to any such proposition. These considerations, together with the facts in evidence already referred to, presented a case for the consideration of the jury to find whether, within the rule often laid down and acted upon by this and other courts, the papers relied on as a bar were not signed under or through excusable negligence or mistake, and so were not operative to bar the claim in suit.

In *Butler v. Regents of University*, 32 Wis. 132, 133, it was held that if a party signed an alleged discharge or acquittance without knowing its contents, and without intending to sign *such* an instrument, he is not bound by it; the evidence in that case tending to prove that he signed the instrument under such circumstances. In *Schultz v. C. & N. W. R. Co.* 44 Wis. 638, 645, a release or compromise of a claim for personal injury against a railroad company was held inoperative on the ground that it was signed by the party without knowing its contents or intending to sign such an instrument, and that he was therefore not bound by it; he having testified that he never settled with the defendant. In *Bussian v. M., L. S. & W. R. Co.* 56 Wis. 326, 333, which was a similar case, it was held that it might be shown that a release pleaded in bar was obtained by fraud, misrepresentation, or undue influence. In the case of *Lusted v. C. & N. W. R. Co.* 71 Wis. 391, a similar question was presented, where the release was not read to the plaintiff, who was sick in bed, and, when handed to him, he tried to read it but could not by reason of dizziness caused by injuries to his face and head; and it was held that a release of damages for personal injuries was not binding, and the plaintiff's ignorance of its contents was not the result of such negligence as would preclude him from avoiding the release. In that case nearly all the authorities relied on by the appellant in this were brought to the attention of

the court.   The cases of *Fuller v. Madison M. Ins. Co.* 36 Wis. 599, and *Sanger v. Dun*, 47 Wis. 615, were distinguished, because the ignorance of the contents of the papers signed was justly attributable to gross negligence on the part of the persons signing them.

The authorities in this state fully sustain the conclusion that, if the instrument was signed through the excusable mistake or negligence of the party, he is not bound by it, although the burden of proof is on him to rebut the presumption of gross negligence.   If grossly negligent, manifestly he would be bound by it; but the presumption is not a conclusive one.   For this reason the motion to direct a verdict for the defendant was properly overruled.   There was sufficient evidence to go to the jury on the question suggested, and the instruction asked for by defendant, which limited the right of a party to avoid an instrument signed by him to the case where false statements or representations are made as to its contents, was properly refused.   The jury were instructed, in substance, that if the assured did waive and abandon his claim to $3,000, and elect to take the claim of weekly indemnity, with the full understanding of what he was doing at the time, he would be bound by such an election, and likewise the plaintiff, as his executor. The question was also submitted to the jury whether, when he signed the proof or claim, he understood and had full knowledge of the contents of it; that, if he fully understood the contents of the statement or proof, and fully acceded to the terms which it contained, then that would be binding upon him; and if, on the other hand, he was in any way deceived or misled by ignorance of what the transaction amounted to, and the jury should so find from the testimony, then he would not be bound.   And so, also, as to the receipt or release containing the statement: " Said company is hereby relieved from any further liability growing out of said injury, whether the result be fatal or other-

wise,"— that, if the jury should find from the evidence that the assured understood the receipt was in full satisfaction of his claim, then it would be binding upon him, and the plaintiff could not recover; but if he was laboring under some mistake, or did not understand what the contents of it were, then it is not of such binding effect but what it can be explained, and that it would only be held to bind to the extent to which it was understood at the time by the parties. That if, from the testimony, at the time he received the $450, he knew that it was payment in full under the weekly indemnity clause, then the jury should answer that question in the affirmative; on the contrary, if he did not know that it was payment in full under that clause of the policy, then their answer to it would be " No." That it was for them to determine from the testimony introduced in the case. There were exceptions to these several instructions, but we think they are in accordance with the principles laid down by this court in similar cases, and hold that the exceptions are not well taken. The issue in respect to the signing of the papers in question was fairly left to the jury, to be found by them upon the evidence; and, in view of all the facts and circumstances of the case, we are of the opinion that there is sufficient evidence to sustain the finding.

The company seemed desirous and overwilling to pay the lesser sum for a claim that had no existence, in order to avoid paying the larger sum for the claim that did exist, and of which it had full knowledge. It is claimed that the assured would not be entitled to both. The jury have found that he did not elect to take the lesser sum in lieu of the greater. It is admitted in the answer that the $450 was paid on account of the policy. The court, however, allowed the sum of $450 to be credited as so much paid on account of the loss of the feet of the assured, so that the defendant has no right to complain that this sum was not

tendered or paid back before this action was commenced, and as a condition of recovery. If this action could not be maintained, clearly the plaintiff was entitled to retain the money. If it could be maintained, and there was no cause of action for weekly indemnity, but was for loss of feet, the most the company has a right to claim is that the payment may be used as a setoff to the plaintiff's claim.

The motion to set aside the verdict and for a new trial was properly overruled. There is no other error assigned requiring particular notice. We think that there was no error of which the defendant has a right to complain.

*By the Court.*— The judgment of the circuit court is affirmed.