[No. 1578. Decided April 24, 1895.]

I. C. SANFORD, *Assignee, Respondent*, v. THE ROYAL INSURANCE COMPANY, *Appellant*.

INSURANCE — CONCEALMENT OF FACTS — RELEASE — FRAUD.

The failure of the assured at the time of making application for insurance to volunteer his fears upon the subject of incendiarism will not render the policy void, when no questions were asked him upon that subject and his fears were based upon the immaterial circumstances that his clerk had shot at a supposed burglar and that an insolvent merchant in the same block whose stock had run down,

had removed his family from town and stored his household goods in a building at a distance from his storeroom.

In an action upon a policy of fire insurance to which a plea of release has been interposed by the defendant, the plaintiff may, under the code system, set up in his reply that the release was procured by fraud, and is not required to first obtain a decree in equity canceling the release before instituting an action upon the policy.

In such an action, it is not necessary to restore the consideration received for the release before attacking it on the ground of fraud, if such restoration be provided for in the judgment sought.

Fraud in procuring the release by the assured of an insurance policy is established, by proof that, after an adjustment of the loss, the agent of the insurance company induced the assured to believe that it was the law, by reading from various law books, that apprehension of incendiarism undisclosed by the assured at the time of application for a policy would avoid it, and that relying upon such belief and the representation of the adjuster, in whom he had confidence, that it would do no good to consult a lawyer, he had executed the release and surrendered the policy.

Where the relation of debtor and creditor exists between an insurance company and the assured, by reason of the fact that the amount of loss under a policy of insurance had been adjusted and determined and there is no *bona fide* ground of dispute concerning the company's liability, the release by the assured of the whole claim in consideration of payment of part is not based upon sufficient consideration, and the assured may maintain an action for the whole amount due.

The failure of the court, in an action upon an insurance policy by an assignee, to charge the jury that the assignee had no greater rights than his assignors would have had, if suit had been brought by them, is not prejudicial.

An instruction, referring to the " facts and circumstances disclosed on the stand by the witnesses," is not misleading when there is also written evidence, when such statement was followed by and connected with the further charge to the jury that " you are the sole judges of the facts. These facts have been given you on the stand through witnesses and exhibits that have been placed in evidence here to enable you to find the facts."

*Appeal from Superior Court, Garfield County.*

*B. L. & J. L. Sharpstein,* for appellant.

*M. F. Gose, Sanderson Reed, M. M. Godman,* and *S. G. Cosgrove,* for respondent.

The opinion of the court was delivered by

GORDON, J.—In March, 1893, John Harford and F. G. Harford (father and son) were partners doing business as such at Pataha City in this state, and, on the 23d day of said month, insured their stock of hardware, etc., including buildings, for the sum of $15,300, represented by ten policies in various companies; the amount of insurance effected in the appellant company being $2,500, $1,000 of which was upon building and $1,500 upon stock. On the 7th day of April of that year said insured property was wholly destroyed by fire. On the 19th day of April following said firm of Harford & Son, and the individual members thereof, made a general assignment for the benefit of all of their creditors, and respondent I. C. Sanford is such assignee. He brought this action upon said policy of insurance.

After the usual denials the answer sets up two affirmative defenses, the first of which is that respondent's assignors, at the time of procuring said insurance, concealed from the appellant and from its agents the fact that said firm and the several members thereof feared damage or destruction of said property by incendiarism, and then "fraudulently represented and stated to the agent of the (appellant) that they had no such fear, when, as a matter of fact, they did at said time so fear the destruction of or damage to the said property from said cause, and that they did thereby, by their said failure to disclose the same and by the concealment thereof and by said misrepresentation thereof, fraudulently induce and cause the said policy of insurance . . . to be issued to them; and that it was in and by said policy, and as a part thereof, contracted and agreed that said policy should be void if the insured had concealed or misrepresented any material fact or

circumstance concerning said insurance or the subject thereof."

The second affirmative defense sets out that on the 17th of April, 1893, and prior to the filing (and prior to making the assignment mentioned in the complaint) the firm of Harford & Son (the insured) "at a time when a controversy and question was pending between (appellant) and said firm as to the liability of the (appellant) under said policy to said firm of Harford & Son, for and in consideration of one dollar paid to said firm, and the further payment to said firm of the premium mentioned in said policy, . . . fully settled and adjusted the said matter, and said considerations were paid and received in full satisfaction and settlement of all demands under said policy, and the said firm then and there, for said consideration, cancelled, surrendered and delivered said policy to this (appellant)."

Replying to the matter set up in said affirmative defenses, the plaintiff denied the allegations of the answer concerning fraudulent representation and concealment of fears of incendiarism, and alleged that the appellant so issued and delivered up the policy after a full, true and complete statement, and with full knowledge of all the facts and circumstances; and replying to the defense of release and surrender of the policy, alleged that the same was procured by the fraud, deceit and misrepresentation of appellant, its agent and adjuster, acting in concert with one Whitley, who was the agent and adjuster of some of the other companies which had written insurance upon said stock. The particular circumstances of such alleged fraud and misrepresentation are set out at great length in the reply.

There was a trial and verdict for respondent, and

thereafter appellant's motion for a new trial having been overruled, judgment was entered upon the verdict, from which this appeal is prosecuted.

Numerous errors are assigned by appellant, but there are four principal grounds of contention, the disposition of which must control the cause. They are (1) That the insured misrepresented or concealed material facts and circumstances concerning said proposed risk, at the time application was made for insurance; (2) It is contended that an action could not be maintained for a recovery of the loss under the policy until the release had been canceled by decree in equity; (3) That the release and surrender of the policies could not be attacked for fraud, either in law or in equity, until the respondent had restored to the appellant company the consideration received by his assignors (said consideration being the premium note and a cash consideration of one dollar); and (4) That the evidence upon the trial was not sufficient to avoid the so-called "release."

1. The question of whether the insured had concealed or misrepresented any material fact concerning the insurance or their fears of incendiarism (if such were entertained) was properly a question to be determined by the jury under correct instructions, which, from an examination of the record, we think were given. No written application for insurance was required or given in this case, and there is nothing in the record at all tending to show that any inquiry was made of the insured, or either of them, as to their fears from incendiary causes. It appears, however, that after the loss occurred, J. L. Fuller, appellant's agent and adjuster, went to Pataha City for the purpose of adjusting said loss, and was so employed for the period of upwards of a week. That while so en-

gaged, and at his instance and request, the younger Harford went before a justice of the peace and was sworn according to law to make answers to questions to be propounded to him by the said Fuller, adjuster. In the examination which followed he stated that some time in March, 1893, one Williamson, a clerk of said firm, had been aroused in the night by some one picking at the lock of the outer door of his house; that upon such person (supposed to have been a burglar) opening the door, Williamson had fired upon him, the supposed burglar making immediate flight; that he, Harford, feared that the burglar "might burn us out" in revenge against Williamson, who, he might have believed, was a partner in the business. On said examination the said Harford further stated that he had suspected one R. P. Reynolds, who was doing business in a one-story building situated in the same block, of incendiary intentions. His stock of goods having run down and he being indebted to said firm of Harford & Son in a large sum of money, and having failed to secure the same, the firm had placed the claim in the hands of an attorney for collection, and Reynolds' family had left town with valuables in the way of clothing, and household goods had been stored in a smokehouse situated some distance from the business property and out of danger; "all of which caused us to us to suspicion the said Reynolds. For the two reasons above mentioned we feared incendiarism to the extent of causing us to protect ourselves with insurance." The question was then asked: "Did you tell any one of your reasons for fear of being burned out?" Answer: "Yes, I told O. S. Williamson, our clerk, and L. M. Carter, the marshal of Pataha City, and to no one else whomsoever."

Upon the trial F. G. Harford testified that prior to

the issuance of the policies and while appellant's agent King was examining the premises and making a survey of the risk, he (witness) informed him of the difficulty occurring between their clerk Williamson and the supposed burglar; also mentioning the circumstances surrounding the Reynolds' property, and his testimony in this regard is strongly corroborated by that of the plaintiff, Sanford, who testified that he was present at a conversation between King and one Wills (who was agent for some of the companies having policies upon the same risk); in which conversation King related to Wills that Harford had told him that he was afraid of being burned out, etc. This was prior to the issuance of the policies. It further appears that the witness Sanford informed said adjuster Fuller, during the time that he was engaged in adjusting said loss, of such conversation between King and Wills concerning Harford's fears of incendiarism. The agent King was sworn as a witness and denied that Harford expressed any fears of incendiarsm to him prior to the issuance of the policies, or that he stated any circumstances connected therewith; but he did not deny having the conversation with Wills to which Sanford had testified; nor did he make any explanation of it; nor did the adjuster Fuller deny that Sanford had so informed him of it. We are satisfied from an examination of the record upon this question that a full statement of the grounds upon which the younger Harford seemed to entertain some fear of incendiarism was communicated to King, the agent of the appellant, prior to his issuing the policy in this case. Indeed, the condition of the record is such as to admit of little doubt of it.

But the same result is reached viewing the evidence in a light most favorable for the appellant. No writ-

ten application having been required and no questions asked of the assured upon the subject of incendiarism, the fact that Harford actually entertained such fear, based upon the circumstances already detailed, would not render the policy void.

"When no inquiries are made, the *intention* of the assured becomes material, and to avoid the policy it must be found not only that the matter was material, but also that it was intentionally and fraudulently concealed." May, Insurance (3d ed.) § 207.

See also, 1 Wood, Fire Insurance (2d ed.), p. 517; *Alkan v. N. H. Ins. Co.*, 53 Wis, 136 (10 N. W. 91).

We do not think that failure of the assured to volunteer the statement concerning the difficulty which his clerk had experienced with the supposed burglar, or his opinion as to the condition and standing of Reynolds, amounted to such fraudulent concealment as would invalidate the policy. We think the circumstances were not material nor of a character to justify any well-grounded fear or apprehension, and are inclined to regard them as frivolous and trivial. 1 Wood, Fire Insurance (2 ed.), p. 216.

2. The next question for consideration is whether the action could be maintained until the release and so-called "settlement" had been canceled by a decree in equity. Upon the proposition here stated the authorities are conflicting. We believe, however, that to permit the action to be brought in the present form, and all of the rights of the parties to be determined and adjusted therein, best harmonizes with the spirit of our code system. The right to do so is upheld in: *O'Brien v. Chicago, etc., Ry. Co.*, 57 N. W. (Iowa) 425; *Addyston Pipe & Steel Co. v. Copple*, 22 S. W. (Ky.) 323; *Butler v. Richmond, etc., R. R. Co.*, 88 Ga. 594 (15 S. E. 668); *Sheanon v. Pac. Mut. Life Ins. Co.*, 83 Wis. 507 (53

N. W. 878); *O'Neil v. Lake Superior Iron Co.,* 63 Mich. 690 (30 N. W. 688); *Bean v. Western, etc., R. R. Co.,* 107 N. C. 731 (12 S. E. 600); *St. Louis, etc., Ry. v. Higgins,* 44 Ark. 293; *Lusted v. C. & N. W. Ry. Co.,* 71 Wis. 391 (36 N. W. 857); *Chicago, etc., Ry. Co. v. Lewis,* 109 Ill. 120; *Chicago, etc., Ry. Co. v. Doyle,* 18 Kan. 58; *Eagle Packet Co. v. Defries,* 94 Ill. 598 (34 Am. Rep. 245); *Bussian v. Milwaukee, etc., Ry. Co.,* 56 Wis. 325 (14 N. W. 452).

In the last case cited the court say:

" It is claimed by the learned counsel for the appellant that the release given by the plaintiff pending the action was a complete defense to the action, and that there was no evidence in the case which would justify either the court or jury in setting it aside for fraud, misrepresentation, or any other cause. The learned counsel takes the ground that the release can only be impeached by a proceeding in equity, and that the submission of the question to the jury, if proper for any purpose, it should be held that it was simply for the purpose of aiding the court in the determination of the question of fraud, and that their verdict should have no more conclusive effect than a verdict of a jury upon any other issue of fact in an equitable action. We think the learned counsel is in error in regard to the practice. If the release was obtained by fraud or misrepresentation, then it is void, and that question could always be tried in a court at law before the adoption of the code. Chitty, in his work on pleadings, says that to a plea of release it is proper to reply that the release was obtained by fraud. 2 Chitty on Pl. (16th Am. Ed.) 455; also, 1 Chitty on Pl. 692, 693, and note d."

The supreme court of Missouri divided upon this question in the recent case of *Girard v. St. Louis Car Wheel Company,* 27 S. W. (Mo.) 648, a majority of the court holding that resort to equity to cancel the release need not be made prior to maintaining the action at

law. From the opinion of Mr. Justice BARCLAY in that case we quote:

" Defendant's first proposition is that this action for damages is not maintainable, because the release has not been set aside by a decree in equity; in other words, it is claimed that the paper in question is a complete defense at law to the cause of action to which it relates, no matter how the paper may have been obtained. · This position has been defended with much ability, but no resources of counsel are · sufficient to conceal its inherent weakness. . . . The paper in question is, in contemplation of law, nothing more than the form of a contract; and, on finding that the substance which should give life to an obligation is wanting, the court may cast aside the form and proceed to judgment, notwithstanding the fraud which may have brought the verisimilitude of an obligation into existence. *Hartshorn v. Day*, 19 How. 211. . . . A court of law, upon ascertaining such a fraud, may properly pass over it to the conclusion which it considers to be just; thus, in effect, discarding the fraud as an obstacle to the exercise of its jurisdiction."

From the concurring opinion of Mr. Justice MACFARLANE in the same case we quote:

"This leaves simply the question whether the reply properly put in issue the validity of the release; or, in other words, whether a release of the character of this one *can be avoided, in an action at law*, on the ground of fraud charged in the reply to the answer of defendant setting it up in bar of plaintiff's action. Defendant insists that it is a complete bar until canceled by the decree of a court of equity. It is undoubtedly true that fraud was one of the original heads of equity jurisdiction, 'but,' says Blackstone, 'every kind of fraud is equally cognizable in a court of law, and some frauds are cognizable only there; as fraud in obtaining a devise of lands.' 2 Bl. Comm. 431. 'Courts of equity and courts of law have a concurrent jurisdiction to suppress and relieve against fraud.' Lord MANSFIELD, in *Bright v. Eynon*, 1 Burrows, 396. This principle has

received recognition and approval by this court from the decision of *Montgomery v. Tipton*, 1 Mo. 446, to that of *Clough v. Holden*, 115 Mo. 336 (21 S. W. 1071, 37 Am. St. Rep. 393). . . . The principal ground of objection urged to the right to raise the question of fraud by reply is that such a course of proceeding permits questions of fraud to be tried by a jury, instead of a chancellor, and the rescission of a release to be obtained upon evidence which would have been insufficient in a court of equity. But this objection can be urged with equal plausibility to pleading fraud by answer, which, it is conceded may be done. *When we keep in view the fact that courts of law have jurisdiction to relieve against fraud, it would seem to follow logically that its jurisdiction may be exercised to relieve against a fraudulent contract pleaded as a defense, as well as against a fraudulent contract which is made the subject matter of the suit.* It would seem wholly unnecessary and oppressive to drive a plaintiff to another jurisdiction for relief against a defense . . . when the forum having all the parties before it has concurrent jurisdiction of the same subject matter."

This view is, we think, supported by what is said in the case of *New York Cent. Ins. Co. v. National Protection Ins. Co.*, 14 N. Y. 85, although it must be admitted that upon the question we are now considering the court of appeals of that state have held contrary to the conclusion which we have reached. In that case the learned Chief Justice DENIO says:

"As the courts of the state are now constituted, they apply legal and equitable rules and maxims indiscriminately in every case. In a suit which could not formerly have been defended at law, but as to which the defendant would have been relieved in equity, he can now have the like relief in the first action. . . . It was always theoretically unreasonable . . . that in one branch of the judiciary the court should hold that the party prosecuted had no defense, while in another branch the judges should decide that the plaint-

iff had no right to recover. The authors of the Code
aiming at greater theoretical perfection, have abolished
the anomaly; *and now when an action is prosecuted we
inquire whether, taking into consideration all the princi-
ples of law and equity bearing upon the case, the plaintiff
ought to recover.*"

Under the code of this state legal and equitable
rights are administered by one court and in one form
of proceeding, and we venture to assert that the ten-
dency of modern authority, as a result we believe of
the extension of the code system, supports the view of
this question which we have herein expressed, and
which we are constrained to adopt.

And this brings us to the third principal contention,
viz., that the release could not be attacked for fraud
or otherwise until respondent had restored to the ap-
pellant the considerations received therefor. This is
somewhat intimately connected with the preceding
question, and many of the authorities above cited also
hold that it is not necessary for a plaintiff to pay back,
or offer to pay back, the money received at the time of
signing the release as a condition precedent to his
right to sue upon his claim for loss or damages, where
the judgment sought will accomplish this result. In
many of the cases so cited it is held to be sufficient
that upon the trial the jury were permitted to give the
defendent credit for the money paid at the time the re-
lease, so-called, was executed. *Chicago, etc., R. R. v.
Doyle, supra; O'Brien v. R. R. Co., supra; O'Neil v. L. S. I.
Co., supra.*

In *Sheanon v. Pac. Mut. Life Ins. Co., supra,* it is said
that:

"The $450 being credited upon the recovery of the
full amount, the company cannot complain that said
sum was not tendered or paid back before the com-
mencement of the action, as a condition of recovery."

In *Harris v. Equitable Life Assurance Society*, 64 N. Y. 196, the court say:

"In *Allerton v. Allerton* (50 N. Y. 670) this court held that the rule that he who seeks to rescind an agreement upon the ground of fraud must place the other party in as good a condition as that in which he was when the agreement was made, is satisfied if the judgment asked for will accomplish that result, and in such case no offer to return that which was received is necessary. It is true, in the case cited, the plaintiff had brought the action claiming that there was fraud, and that the contract was void; but the principle is equally applicable where the defendant asserts that the contract was fraudulent and void. · . . . 'The law looks to the result and not the means.' It was also remarked that the reason of the rule is, that the party shall not retain the thing which is the subject of the contract, and, on his action, recover the price paid for it, or retain the price paid and, on his action, recover the thing; and that this reason is satisfied when the claim made and the judgment sought by the plaintiff will leave with the defendant all that he parted with, and thus put him in as good plight as at the time of the agreement."

This view is supported in the more recent case of *Berry v. American Cent. Ins. Co.*, 132 N. Y. 49 (30 N. E. 254, 28 Am. St. Rep. 548):

"One who attempts to rescind a transaction on the ground of fraud is not required to restore that which in any event he would be entitled to retain either by virtue of the contract sought to be set aside or of the original liability."

See, also, *Kley v. Healy*, 127 N. Y. 555 (28 N. E. 593); *Fisher v. Bishop*, 108 N. Y. 25 (15 N. E. 331, 2 Am. St. Rep. 357).

Counsel for appellant, in their very able and exhaustive brief, concede that in suits in equity, where a bill is filed for a rescission, a restoration of the consideration received is not necessary before suit, it being

sufficient that such restoration be provided for by the judgment. Such being the rule in equity, it would seem to follow as a result of our holding upon the preceding question that the rule is applicable to the case at bar. The only consideration which appellant claims was paid to respondent's assignors for the release was the premium note and one dollar. Concerning the payment of the "one dollar" expressed in the release, the evidence showed that it was not paid or mentioned in the talk leading up to the settlement, but on the morning following the sum of $10 was handed to the younger Harford by the adjuster Fuller, who says that he then told Harford it was the amount due upon the ten policies. Harford testified that he did not understand that it had anything to do with the surrender of the policies; that the adjusters had occupied their banking office for a period of about ten days, having a key to the same during the time that they were at work upon the adjustment of the fire losses, and that he understood that the $10 was to be considered as compensation for the use so made of their office. But we think it matters little which view is adopted. Before entering judgment in this case the respondent remitted and appellant had credit in the judgment for the full amount of the premium note and the $10 additional. Hence, we think that the case falls squarely within the rule announced in the foregoing decisions. Then, too, the attitude of the appellant throughout as well as before the litigation, and its plea of release indicate very clearly that any tender or repayment would have been useless.

"It has been decisively held in other·cases.that no preliminary tender can be insisted upon as a bar to legal action *where the facts show that the tender would have been rejected.*" *Girard v. St. Louis Car Wheel Co., supra.*

See, also, *Deichmann v. Deichmann*, 49 Mo. 107; Bigelow, Fraud (1888), p. 424:

The evidence shows, and it is admitted by the appellant, that on the morning succeeding the execution of the so-called release a demand was made for a return of the policies by the younger Harford. The conduct of the adjuster Fuller, upon whom this demand was made, was such as to make it clearly apparent that it would have been entirely useless and unavailing to have offered or tendered the premium note. The judgment in this case fully protects the appellant, and that, we think, is the controlling consideration.

4. It is contended that the evidence is insufficient to set aside or avoid the "release." As has been already stated, the agent and adjuster of the appellant had been at the scene of the fire and consumed several days in examining witnesses and taking preliminary proofs. The value of the property covered by the policy of insurance had been determined and agreed upon. The amount of the loss and the sum to which respondent's assignors were entitled, if entitled to any sum, had also been determined. It does not appear that up to that time any question had been raised as to the liability of the appellant upon the policy. If any doubt existed in the mind of Fuller upon that question, it had not been communicated to the assured.

Concerning the so-called settlement, John Harford (the father) testified:

" We were good friends. They (the adjusters) said they had never been treated so nice. They had never met a family that they got so many accommodations from. The books were all correct. The bills were all there at the office. . . . The next thing I heard of the agents, Freddie came up one night about eight o'clock and called me out of bed, and said he would like to have me go down to the office. I said, ' Fred-

die, I can't go down tonight.' He said he was anxious to get through, or something. I said, 'Maybe I will go. Maybe we will get a check for our money.' I went down. Mr. Whitley was there,

"Q. Had you seen Mr. Whitley before that time? A. I think that is the first time I ever saw Mr. Whitley. Mr Fuller said, 'Gentlemen, this is Mr. Whitley. He is from San Francisco. He has come up here with authority to stop all of this adjustment; the company rules your policies null and void.' Said Mr. Fuller, 'You insured your property for fear of being burned out by incendiarism, and you kept it a secret.' I said, 'Kept what a secret?' He said, 'This shooting going on, and a man running out from under the house.' He said it hadn't been told to their agents. If it had been told to their agent before the policy was taken out, then the company would be liable. But as Freddie hadn't told the agent, the policies were null and void. Freddie said, 'We will think about this two or three days.' Mr. Whitley said, 'You sign these papers tonight. Fix it up, and we will come back tomorrow morning by the time you are in your office, and arrange matters between the companies and yourselves so that it will be satisfactory to all.' The papers were signed under that agreement. The next morning I came to the office. Freddie had gone down before me, and had in the meantime thought about his telling Mr. King about the shooting, and said, 'I will go down and have those policies.' He went down and called Mr. Fuller out. Mr. Fuller says, 'They don't amount to anything; they are signed, and Mr. Whitley has got them and gone.' If Mr. Whitley had come back the next morning and left those papers in that office as he should have done, he never would have taken them, and I would have had writings in so many dollars and cents to Harford & Son.

"Q. Now state, Mr. Harford, whether or not at any time during this adjustment from the time Mr. Fuller came upon the ground, he mentioned that those policies were null and void, or anything to that effect? A. No, sir. On the contrary, everything was smooth.

" Q. State whether or not, Mr. Harford, when you were called out of bed and went down there, that was the first time they told you the policies were void? A. That was the first time."

Without setting out all of the evidence as to what occurred at the meeting between Fuller, Whitley and the Harfords, we think it may be safely said that the evidence shows that Fuller and Whitley acted in the matter for the appellant; that Whitley read from law books and, among others, from the *New York Code;* that the question of misrepresentation or concealment was advanced by them for the first time at that meeting; that they represented to the assured that they were their friends, and that they correctly stated the law; that it would be useless for them to see a lawyer. From Fuller's testimony we quote: " I told them in my opinion it would do no good to consult a lawyer in a case of that kind." The assured seem to have had the utmost confidence in Fuller; indeed, his conduct toward them during the week preceding the night upon which the release was obtained was of a character to inspire them with confidence; and they seem to have had due regard for his superior knowledge and experience in such matters.

But appellant insists that if respondent's assignors did not know the law they were at liberty to refuse to entertain the settlement until they had conferred with an attorney; that they ought not to have relied upon the legal opinion of one dealing with them adversely; but if they chose to so rely, they could not thereby be defrauded. We think that, if by their representations, statements and conduct, Fuller and Whitley induced the assured to believe that such was the law, when in fact it was otherwise, and under such belief so induced the assured were led into consenting

to surrender the policies and accepting their premium note in exchange therefor, such surrender and release so obtained ought not to be held to bar their right of recovery.

In *Berry v. A. C. Ins. Co.*, 132 N. Y. 49 (30 N. E. 254), it is said:

"There is no question, of course, but that a court of equity cannot grant relief solely upon a mistake of law. But there was here more than a mistake. There was a surrender of legal rights intentionally induced and procured by a false representation as to the law governing the case. The defendant must be presumed to have known that it was liable for the whole loss and by falsely representing that under the law applicable to the case the policy was void, when in fact it was valid, it induced the plaintiff to rely upon the superior knowledge that it possessed upon the subject and to surrender to it his claim. This clearly constituted fraud, and there would be manifest injustice in upholding a settlement *under such circumstances.*"

Nor do we think that there was any consideration supporting such release and surrender.

See, also, *Bank of North America v. Crandall*, 87 Mo. 208; *Mudsill Mining Co. v. Watrous*, 61 Fed. 163; *Hess v. Culver*, 77 Mich. 598 (43 N. W. 994, 18 Am. St. Rep. 421); *Averill v. Wood*, 78 Mich. 342 (44 N. W. 381).

In the case last cited the court say:

"To hold that a man cannot be defrauded by false representations because he is presumed to know the law, which presumption is a violent one in most cases, would be to place the ignorant and foolish, the persons who are generally the victims of fraud, beyond the protection of the law."

At defendant's request the court charged the jury as follows:

"1. If you find from the evidence in this case that a controversy existed between the firm of Harford &

Son and defendant as to the liability of defendant on the policy of insurance mentioned in the pleadings, and while the same was in existence and before the said firm had made an assignment for the benefit of their creditors, the defendant paid said firm any sum whatever, and that said sum was so paid and received in full settlement of all liability under said policy, and said policy surrendered, your verdict should be for the defendant.

" 2. The plaintiff in this case has alleged fraud on the part of the defendant by its agents, and the court instructs you that the burden of proving such fraud is upon the plaintiff, and that upon the question of fraud the plaintiff must prevail, if at all, not only upon a preponderance of evidence, but such preponderance must be based upon evidence that is clear and strong, satisfactory and convincing, and especially so when it is proposed to impeach any written instrument on the ground of fraud by oral testimony of a party to the instrument.

" 3. The defendant in this case has set up a release and discharge of liability under the policy mentioned in the pleadings and the court instructs you that such a release, if it was made, cannot be set aside upon any but the strongest and clearest testimony. To infer fraud from anything but the strongest and most satisfactory proof is to infer a criminal thought or disposition in a man which is against the presumption of law.

" 4. A party making a contract of settlement in consideration of one dollar, or for any valuable consideration, cannot avoid the contract upon the ground of fraudulent statements unless he relied upon such statements, and also had a right to rely upon them."

In view of the foregoing instructions (which were certainly as favorable to appellant as the law would warrant), and the evidence submitted upon the subject of the settlement and release, we think the verdict concludes the appellant.

But in another view of this branch of the case the

same result is reached. As already noticed, the amount of the loss had been determined and agreed upon prior to the time of obtaining such release. Hence, at that time the appellant was actually indebted in the amount of the loss so determined, or it was not indebted in any sum whatever. In other words, the policy was absolutely valid, and appellant's obligation to pay the amount of the loss as determined by the adjustment was complete at the time of the pretended settlement, or it was invalid and imposed no obligation whatever. If invalid, it was only so because of the fraudulent representations or concealment of the assured concerning incendiarism. The invalidity of the policy was not assailed or asserted for any other reason. Now, as we have seen, it was not invalid for that reason; so that it manifestly appears that at the time when the appellant's adjuster procured from the respondent's assignors the release and surrender in question, the relation of debtor and creditor absolutely existed between the company and the assured. The demand was neither an unliquidated demand nor could the right to recover be considered doubtful. The adjustment had been completed and the amount that was payable had been ascertained.

"After loss . . . the obligation of the insurer to pay the loss became absolute. The demand against the insurer then became a mere chose in action for the sum payable pursuant to the contract. The relation between the assured and insurer thus became that of *creditor and debtor*, and the policy ceased to be significant except as evidence of the existence and amount of the debt." *Alkan v. N. H. Ins. Co., supra.*

"Until a loss has occured, the liability is contingent; there may never be a liability. But when the loss has happened . . . the liability is fixed. There is now a debt, and no reason is perceived, why this, like

any other debt, should not be assignable." *Walters v. Washington Ins. Co.*, 1 Iowa, 404a (63 Am. Dec. 451).

See, also, *Carter v. Humboldt Fire Ins. Co.*, 12 Iowa, 287.

"Whenever the loss occurs and the company have notice and are furnished with the preliminary proofs required by the conditions [of the policy] the amount of the loss becomes, by force of the contract, a debt payable to the insured presently or at the time appointed in the policy." *Courtney v. New York City Ins. Co.*, 28 Barb. 116.

See, also, *Seyk v. Millers National Ins. Co.*, 74 Wis. 67 (41 N. W. 443); 2 Wood, Fire Ins. (2d ed.) p. 758.

It follows from what has been said that at the time when this policy was surrendered and the release executed, the assured were entitled to payment from the company of the amount of the loss. Their right to so recover was not a doubtful right. The amount which they were entitled to recover was not uncertain. The liability to make payment of such amount had become fixed; and as the sole consideration for the release and surrender of the policy which thus entitled them to this large sum of money, appellant paid in cash and by note (its equivalent) $119.75, a fractional part only of what it was actually owing.

"The rule is well established that where the facts show clearly a certain sum to be due from one person to another, a release of the entire sum upon payment of a part is without consideration, and the creditor may still sue and recover the residue. If there be a *bona fide* dispute as to the amount due, such dispute may be the subject of a compromise and payment of a certain sum as a satisfaction of the entire claim, but where the larger sum is admitted to be due, *or the circumstances of the case show that there was no good reason to doubt that it was due, the release of the whole upon payment of part will not be considered as a compromise, but*

*will be treated as without consideration and void."* *Fire
Insurance Association v. Wickham,* 141 U. S. 564 (12
Sup. Ct. 84).

A wrongful assertion of a claim is no ground for
compromise. *Mulholland v. Bartlett,* 74 Ill. 58.

As has been heretofore noticed in this opinion, the
adjuster Fuller had, prior to the time of this so-called
settlement, been informed by Sanford of the conversa-
tion between King and Wills, held prior to issuing the
policy here sued upon; in which conversation King
(appellant's agent) had said to Wills that Harford had
told him of his fears of incendiarism. That the agent
of the appellant *was,* prior to the issuance of this
policy, so informed by Harford, we have already said
the record admits of little doubt; and it further ap-
pearing that Fuller had also been advised of such fact
prior to his urging the invalidity of the policy, it can
not be said that the assured's right to recover was, at
that time, a doubtful right, nor that there was or could
be any *bona fide* dispute concerning it.

"Payment by a debtor of a part of his debt is not a
satisfaction of the whole, except it be made and ac-
cepted upon some new consideration." *United States
v. Bostwick,* 94 U. S. 53.

We deem it unnecessary to multiply authorities upon
this proposition. We think that it must be conceded
that respondent, as assignee, has no greater rights than
the assignors would have had if suit had been brought
by them. The assignment was made after the loss oc-
curred, and gave the assignee the right to recover
subject to any defense that could have been made
had there been no assignment. *Archer v. Merchants',
etc., Ins. Co.,* 43 Mo. 434; *Walters v. Wash. Ins. Co.,
supra.* But we cannot see how appellant could have
been prejudiced by the court's failure to so instruct the

jury. We think it was sufficient to give them the law applicable to the case as it was presented by the evidence.

Nor do we think that the court's reference to the "facts and circumstances disclosed on the stand by the witnesses" constitutes reversible error. It was immediately followed by and connected with the further statement: "You are the sole judges of the facts. You are empaneled to try the facts. These facts have been given you on the stand through witnesses and *exhibits that have been placed* in evidence here to enable you to find the facts." So connected, it seems impossible that the jury could have been misled. There is a vast difference between the instruction here complained of, and the one that was adjudged erroneous in *Gottstein v. Seattle Lumber Co.*, 7 Wash. 428 (35 Pac. 133); and we think that the reversal in that case was not due to the giving of such erroneous instruction.

The other alleged errors which have been assigned in appellant's brief have been severally examined, and without entering into a discussion of them in detail, we deem it sufficient to say that we find no error in the record that warrants this court in reversing the judgment. Many intricate questions were presented for ruling upon the trial of this cause in the lower court, and we think the record singularly free from error. The charge of the learned judge was comprehensive and fair. The briefs of counsel in this court have been very able and exhaustive, and, after a painstaking examination of the entire record, we think the judgment appealed from must be affirmed.

DUNBAR, SCOTT and ANDERS, JJ., concur.