[No. 9244. Department One. June 23, 1911.]

FREDERICK BADERE, *Appellant*, v. JOHN C. GOODRICH *et al.*,
*Respondents.*[1]

CORPORATIONS—SALE OF STOCK—FRAUD—EVIDENCE — SUFFICIENCY.
Where plaintiff was induced to sell the controlling interest in a
corporation, and in an action for damages, claimed that defendant
was guilty of fraud, and wrongfully discharged the plaintiff as an
officer, and so mismanaged the corporation that its assets were sold
in bankruptcy proceedings, to plaintiff's damage in a sum equal to
the value of his stock in the company, the evidence is insufficient
to establish defendant's fraud in the purchase of the stock, where it
appears that plaintiff was solicitous to sell after several months
negotiations, that the price was fair and the sale without fraudu-
lent inducement and there was no fraud in the sale in bankruptcy,
that the plaintiff was discharged from his position for good cause,
and that the bankruptcy proceeding resulted from plaintiff's refusal
to advance an inconsiderable sum as his *pro rata* share for the
renewal of a mortgage due to a bank.

CORPORATIONS — OFFICERS — EMPLOYMENT — DISCHARGE — SALE OF
STOCK—CONSIDERATION. Where a stockholder sold a controlling in-
terest in the stock in consideration of $1,000 and of a contract to
employ him as secretary for one year, the obligation is mutual and
he is subject to discharge for diverting property and violating the
by-laws, and cannot recover the value of his stock for failure of
consideration.

CORPORATIONS—EMPLOYMENT OF OFFICER — CONTRACT — BREACH—
LIABILITY OF STOCKHOLDER. Majority stockholders are not liable for
the wrongful discharge by the corporation of one of its officers.

SAME—DISCHARGE—RECOVERY FOR SERVICES. Upon the dismissal
for good cause of an officer of a corporation employed for one year,
his recovery is limited to *quantum meruit* for the service rendered
up to the time of the discharge.

GOSE, J., dissents.

Appeal from a judgment of the superior court for King
county, Tallman, J., entered August 11, 1910, upon grant-
ing a nonsuit in an action for damages, after a trial before
the court and a jury. Affirmed.

*E. P. Edsen* and *John E. Humphries*, for appellant.

*Shank & Smith*, for respondents.

[1]Reported in 116 Pac. 274.

CHADWICK, J.—On April 23, 1906, Frederick Badere, I. Badere, and John P. Badere incorporated the Teanaway Coal and Mining Company. The Baderes owned certain property in Kittitas county, which they made over to the corporation; so that the capital stock of the company, 3,500 shares of a par value of $100, was represented by 320 acres of land which the appellant and his brother had acquired under the stone and timber act, 286 acres of land which they purchased of the Northern Pacific Railway at $2.50 per acre; 40 acres of land which had been purchased for $700; and a sawmill and certain personal property which had been bought for $4,570. In addition to the value of the property, some money had been spent in the way of improvements, the amount of which does not definitely appear. There was, at the time of the incorporation, a mortgage indebtedness of $8,600. It appears that the Baderes were financially unable to carry on and develop the property of the corporation, and sought to interest respondent Goodrich, who had some means, in the company. After a time, he bought one-half of the capital stock. He paid for one-fourth $8,000, and for the other one-fourth $6,000. He also made two loans to the company, one for $11,500 which was used for the purchase of 160 acres of land, and one for $2,000 which went for general purposes.

The affairs of the company still languishing, appellant sought to induce Goodrich to take over the control of the company. Negotiations tending to this conclusion ran over several months. Goodrich had taken the matter up with a Mr. Strahorn of Spokane, who advised him that, the land being in the territory of the Northern Pacific Railway and its products subject to transportation by that company, the investment would probably not be satisfactory should the value of the property prove to be in coal. Goodrich went east, remaining five or six months. Upon his return, appellant renewed his importunities, the result being that Goodrich took over the control of the property and advanced

$5,000 for the uses of the company. On November 10, 1906, a contract evidencing this agreement was entered into, the material parts of which follow:

"That said party of the first part agrees to pay to said party of the second part the sum of one thousand ($1,000) dollars lawful money of the United States of America, as soon as said party of the second part assigns to said party of the first part one hundred (100) shares of the capital stock of the Teanaway Coal & Mining Company.

"That in consideration of the assignment by said Frederick Badere of one hundred (100) shares of said capital stock to said John C. Goodrich, it is hereby mutually agreed that said Badere shall, for the period of one year from the date of such assignment, occupy and discharge the duties of general manager and secretary and treasurer of the said Teanaway Coal &.Mining Co., as prescribed by the by-laws.

"As a further consideration for the assignment of said one hundred (100) shares by said Badere to said Goodrich, said Goodrich, within the next thirty days, agrees to advance the sum of five thousand ($5,000) dollars, to be used in making investments for the said Teanaway Coal & Mining Co., two thousand to be invested in the company's name and the balance in the name of the second party, and in case of refusal by the said Goodrich to so advance said five thousand ($5,000) dollars, the assignment of said one hundred shares (100) of the capital stock of the said Teanaway Coal & Mining Company, shall become null and void and of no effect whatever."

Accordingly 100 shares of stock was made over to Goodrich, for which he paid Badere $1,000, and he advanced to the company, subject to the check and control of Badere, the sum of $5,000. Goodrich went east again and Badere assumed the control of the company's affairs, a general store having by this time become a part of their scheme. He continued as such manager until March 30, 1907, when he was removed at a special meeting of the board of trustees, Mrs. Goodrich having in the meantime taken an assignment of enough stock to qualify her to vote at the meeting.

It does not appear that Badere rendered services of any

value to the company while engaged as manager. It does appear that, in violation of an amendment to the by-laws adopted September 14, 1906, providing that "the trustees shall contract no indebtedness whatsoever excepting that which is now due and owing by the corporation and the indebtedness which shall be created in favor of John C. Goodrich, without the unanimous approval of the stockholders, it being the intention of these by-laws to provide for the operations of the company upon a strictly cash basis and not otherwise," he diverted $1,310 of the $5,000 advanced under the contract for purposes foreign to those for which it was to be used, and in violation of his trust and duty had made his brother an agent to select and get options on timber lands, agreeing to pay him, without regard to quality or location, a commission of fifty cents per thousand feet on all options he could obtain within a year. There are also other incidents of lesser consequence tending to show his disqualification to manage the company and his indifference to his contract. Upon this state of facts, Goodrich justifies his ouster of Badere from the management of the company.

At the time Goodrich took over the affairs of the company, there were debts aggregating between $22,000 and $23,000. About $7,000 to a bank, secured by mortgage, and about $16,000 to Goodrich. On September 7, 1908, Goodrich notified Badere that "in order to pay up the indebtedness owing by the company it seems necessary that the stockholders shall contribute thereto, otherwise we cannot tell what course the creditors will pursue  . . . . I . . . . therefore pass the matter up to the stockholders in order to have action as to whether the remaining stockholders will make payment in order to clear this property." At the same time appellant was notified that the holder of the first indebtedness would accept $1,920.08, being $1,660.27 on the principal and $259.81 interest to October 1, 1908, and take a new note and mortgage for $7,000; that there was cash in the treasury sufficient to meet a part of this demand so that

the balance would be $972.44, which, prorated according to the stock holdings, would make appellant's part $458.91; and that the other stockholders were ready and willing to pay their pro rata share.

Both of these demands were rejected by Badere, he assigning as a reason that it was the duty of the president to finance the company. Thereafter the property was sold in a bankruptcy proceeding under an order of the Federal court. Goodrich became the purchaser of the property. This action was then brought to recover damages; Badere resting his claim therefor upon the alleged destruction of the value of his stock, and for certain sums which it is alleged would have accrued to the company had the management of the company been left to him, the aggregate damages alleged to have been suffered being $250,000. The case went to trial before a jury, and from a judgment of nonsuit, Badere has appealed.

The gravamen of appellant's charge is that respondent John C. Goodrich, who for convenience will be referred to as respondent, and his attorney, for the purpose of enabling respondent to acquire a majority of the stock of the corporation and with the intent to cheat and defraud the appellant, induced him to sell the 100 shares carrying the control, by falsely representing that the clause in the contract providing that appellant should be the manager was a valid and an enforcible contract, and that the appellant believed and relied upon this representation to his undoing.

Appellant testified that he signed the contract against his will; that he insisted upon consulting with his attorney and upon having him present; that this privilege was denied him; that respondent's attorney told him that it was "all right" and "perfectly square" between the parties; that he relied upon these statements, which he colors as coercive, and signed the contract not knowing it was against public policy and void.

It seems to have been conceded by both parties in the trial below and in the original briefs here that the contract

was void as against public policy, upon the authority of
*Hampton v. Buchanan* 51 Wash. 155, 98 Pac. 374; *West
v. Camden*, 135 U. S. 507; but by supplemental brief appel-
lant seeks to show that, because all of the stockholders were
parties to the contract, it is to be distinguished from the
cases just cited and is enforcible. *Kantzler v. Bensinger*,
214 Ill. 589, 73 N. E. 874; *Borland v. Prindle, Weeden & Co.*,
144 Fed. 713; *Lorillard v. Clyde*, 86 N. Y. 384; Alger, Law
of Promoters etc., 247. But whether against public policy
or not seems to us to be immaterial to the main issue. We
find nothing in the record to indicate a fraudulent design on
the part of respondent to secure control of the company.
Notwithstanding the assertion of appellant that respondents'
attorney rushed him into signing the contract, it affirmatively
appears that the writing was simply a culmination of the
negotiations of the parties running over several months, and
that appellant was the solicitous party.

"I told him—he had already been familiar with this prop-
erty once before, probably a year before. This same propo-
sition had been put before him by my brother, possibly a
year before. . . . Now, then, he went away, and was
gone some six or seven months, to the best of my recollection.
In the meantime, we had incorporated our corporation, and
had gone up on the hill, and had opened up this slope. . .

"Q. He was anxious to get the control? A. There was
reasons why; he has got that $1,000 control. Q. He was
anxious to get that? A. Who was? Q. Mr. Goodrich? A.
To get the controlling interest? I think he was. Q. He was
very anxious to get that? A. I think he was. Q. You had
been talking over with him some days previous to that with
reference to it? A. At different times. Q. And the question
of your selling him the control of the company had been
talked over some two or three weeks prior to this time? A.
Oh, I could not recall just the time. Q. At least some days
prior? A. Yes, we talked. Q. You had been threshing out
the whole details? A. We had, from the time I went to see
him in the Stander hotel, when I got him interested to take
hold with us. Q. And he told you he would not put up any
more money unless he got the control? A. There was no re-

marks made about the control especially, any more than he thought he would like to have the control; that was all. It was not threshed out in excess like that. He thought he would just like to have the controlling interest."

Appellant had every opportunity to repudiate the contract; he was not compelled to sign it. The testimony shows that, after it had been executed and a copy carried away by him, he returned and had it corrected to meet his views. Furthermore, in strict accord with the contract, respondent paid him $1,000 in payment of the 100 shares, and put him in complete charge with $5,000 subject to his check. It was not until appellant's mismanagement and incapacity became apparent that he was ousted. He was not ousted because the contract was illegal. If that had been the design, he might have been ousted long before, but it was because he was running the business in defiance of his authority.

The whole conduct of the parties shows that there was no coercion or fraud, or even preconceived intent of obtaining anything from appellant for less than its value. The concern of the parties seemed to be rather that the business should be done on a cash basis and according to the by-laws or direction of the trustees. This was not done, and the majority asserted its right to take over the management. This it had a right to do. Where a contract of employment is made of the character of the one now before us, its obligations must be held to be mutual, and unless the employee fulfill his covenant, the majority stockholders are not bound to sit by and see their property diverted, debts accumulated, and questionable contracts saddled upon the company. The good of the property should be the first concern of each party.

A minority of the court believe that appellant is entitled at least to recover the value of the 100 shares which was made over to respondent to give control of the company. It is contended that, to that extent, the consideration of the contract failed. Our judgment, on the other hand, is that such recovery cannot be had. Appellant was not fraudulently

induced or coerced in giving up his stock. He was paid what at the time seemed full value. Within the prior sixty days appellant had purchased ¼, or 825 shares, for $6,000, or $7.25+ per share, and 825 shares for $8,000, or 9.69+ per share. As illustrative of the character of the testimony relied on to show value, we shall quote the testimony of John Badere, who owned and sold one-fourth of the stock for $8,000. He says:

"Q. You sold a quarter interest for $8,000? A. Yes, sir. Q. And at that time the company owned the ranch? A. Yes. Q. And also the sawmill. A. Yes. Q. And yet with the ranch and the sawmill and this so-called coal land, you sold out your interest in the whole thing on a basis of $32,000 for the whole business, and yet you come here today and tell this jury that that 486 acres of coal land alone is worth $700,000? A. It is. Q. And yet you sold your interest in your coal land which was worth $200,000, you sold it for $8,000? A. Yes, sir."

But if it be conceded that he could recover, his recovery would be the value of the stock at the time of its conversion. Having already obtained this, no action would lie. If appellant is entitled to recover anything, it would be for the value of all his stock (the company being defunct), for the only theory upon which a recovery could be had, either for the value of the 100 shares or the whole number of shares, would be that he has been defrauded by respondent. This, we all conclude, has not been shown.

It is true that appellant and his witnesses estimated the property to be worth $250,000 and more, but these estimates were too vague and speculative to support a verdict. The only testimony which rises to the dignity of evidence as to the value of the coal lands is that of one Hill, a mining engineer called by appellant, who was familiar with the property at the time. He makes its value wholly problematical, the sum of his testimony being:

"Q. You, as a matter of fact, dont know whether there was a vein of coal in there at all, do you? A. I just considered

it was worth prospecting; that the property was worth prospecting at the time I saw it."

It would be inequitable indeed to allow one who had sold his property at a fair price, and who had brought about present conditions by a breach of his own obligations, to sell his stock over again at a speculative price. The record is silent as to any collusion or fraud between respondents and the creditors, or as to any mismanagement on the part of the respondents. On the contrary, as we have pointed out, appellant was given an opportunity to pay a small assessment upon his stock, thus procuring an extension of the mortgage. The reason assigned by the appellant for declining to pay his pro rata of the debt, in view of the by-law forbidding the creation of any new indebtedness, is not to his advantage. Nor does his reason upon the witness stand, that he had no money, harmonize with his testimony that the property is of great value. True, he had assigned his 1,650 shares of stock to the respondent as security for the loan of $11,500 to the company. But if the property was then of the value of a half million dollars or more, as he now asserts, it would seem that he would have experienced no difficulty in clearing his stock and securing a new loan. At least he could have made an effort to that end. Enough has been said to force the conclusion that there was no fraud shown. It may be said that if the employment clause of the contract is not against public policy, the question of damages might accrue upon the issue of wrongful discharge. But appellant does not prosecute his action upon that theory. The corporation is not made a party, and respondents would not in any event be liable for such damages. But if it be held otherwise, respondent or the corporation would not be liable unless the discharge was arbitrary and without cause (26 Cyc. 988; *Nelson v. Pyramid Harbor Packing Co.*, 4 Wash. 689, 30 Pac. 1096); the rule in such cases being that if cause for dismissal be shown there can be no recovery upon the contract, the right to recover being upon *quantum meruit* for

the service rendered up to the time of the discharge. *Hunter v. Litterer & Cabler,* 1 Bax. (60 Tenn.) 168; *Hewitt v. Roudebush,* 24 La. Ann. 254; *Alberts v. Stearns,* 50 Mich. 349, 15 N. W. 505. Cause for the discharge of appellant being shown by the evidence, it follows that it affords no basis for a cause of action either in law or equity. Indeed, the record shows that appellant has been thrice nonsuited; so that, under any aspect of the case, the judgment of the court was right.

A supplemental brief has been filed in this case, in which additional authorities are cited. Inasmuch as they are offered to sustain the theory that respondents so conducted the affairs of the corporation as to result in a fraudulent conversion of the assets of the company, we are of the unanimous opinion that they cannot be held to apply; for, as we have endeavored to show, that theory is not sustained by the record. For that reason they will need no further discussion.

Finding no error in the record, the judgment is affirmed.

DUNBAR, C. J., MOUNT, and PARKER, JJ., concur.

GOSE, J. (dissenting)—The appellant charges, that the contract set forth in the majority opinion was obtained by the respondent husband and his attorney for the purpose of enabling the respondents to acquire a majority of the stock of the corporation, with intent to cheat and defraud the appellant, by falsely representing that the clause in the contract providing that the appellant should be the manager of the corporation for one year was a valid and enforceable contract; that the appellant believed and relied upon the representation; that respondent husband, in furtherance of his fraudulent purpose, assigned certain shares of stock to his wife and co-respondent, giving to respondents a majority of the capital stock; that on March 30, 1907, the respondents, who were then trustees of the corporation and owners of a majority of its capital stock, removed the appellant as manager, secretary and treasurer, and took possession of all

the books, money, papers, and effects; that the respondent refused to invest the $5,000 in accordance with the contract; and that the appellant has received no salary since the date of his dismissal from office.

Briefly stated, the testimony offered by the appellant on the question of fraud tends to show that the appellant was induced to sign the contract by the representations of the respondents' attorney that it was "all right; perfectly square," between the parties; that he objected to signing the contract without having his attorney present; that he relied upon the statements of the respondents' attorney, and that he did not know that the contract was against public policy. It seems to be conceded that the clause providing for the retention of the appellant as manager, secretary and treasurer of the company for the period of one year, is against public policy and void, under the rule announced in *Hampton v. Buchanan*, 51 Wash. 155, 98 Pac. 374, and *West v. Camden*, 135 U. S. 507. If the representations of the respondents' attorney, that the contract was "all right," "perfectly square" between the parties, induced the appellant to enter into it, and if he was so induced to believe that the clause providing for his employment as manager for the period agreed upon was a valid engagement, he is entitled to recover damages. *Sanford v. Royal Ins. Co.*, 11 Wash. 653, 40 Pac. 609; Kerr, Fraud and Mistake, p. 398. See, also, *Bales v. Hunt*, 77 Ind. 355; *Kinney v. Dodge*, 101 Ind. 573; *Evants v. Strode*, 11 Ohio 480.

The question next presented is, What is the measure of the appellant's damages, and how shall they be ascertained? We agree with the majority that there is no fraud shown in the sale of the property in the bankruptcy proceedings, and that there is no evidence that the respondents have mismanaged the corporate affairs. Upon this state of facts, we think that the measure of appellant's damages is the difference between the market value of the one hundred shares of stock at the time the contract was entered into and the sum he re-

ceived for it. *Hazelton v. Carolus*, 132 Ill. App. 512. To that extent the consideration has failed. The contract for services being invalid, he cannot recover for the breach in that behalf. Moreover, to permit him to do so would give him for his stock more than its market value.

The only cause of action disclosed by the evidence is the misrepresentation as to the validity of the management clause in the contract. If the clause were not against public policy, the appellant would be entitled to have his case submitted to the jury upon the alleged breach as to the nonpayment of his salary. Of course, in that event, the respondents could submit evidence as to the cause of his removal, and mitigate the damages by showing his earnings, if any, for the ensuing seven months following his discharge. The appellant offered no evidence as to the value of the one hundred shares of stock at the date of the execution of the contract, but he did show a right to nominal damages. The court, therefore, committed error in granting the nonsuit. The record discloses that the appellant has been thrice nonsuited. I think the parties should be permitted to recast their pleadings, if they so desire, so as to present the single issue as to whether the respondents made the alleged representation, and if so, the reasonable market value of the one hundred shares of stock on the date of the contract. The other issues should be eliminated. I cannot free my mind from the conviction that the majority have decided questions properly triable to a jury, and therefore dissent.