[No. 10061. Department Two. May 8, 1912.]

FRANK W. HICKS, *Respondent,* v. WILL H. JENKINS *et al.,*
*Appellants.*[1]

RELEASE—VALIDITY—FRAUD—MENTAL CAPACITY—EVIDENCE — SUFFICIENCY. Whether a release of damages was understandingly signed is for the jury, where it appears that plaintiff's skull was fractured, his mentality affected, at times he was dazed and dropped into unconsciousness, he testified that he had no memory of signing the release, and at the time was in a highly nervous and excited condition; the circumstances, in connection with gross inadequacy of consideration, tending to establish a constructive fraud.

MASTER AND SERVANT—INJURIES TO SERVANT—FELLOW SERVANTS—SAFE APPLIANCES—SUPERVISORS. A boiler maker, who was sent with two helpers to put up a ventilating stack on a building, is a vice principal and not a fellow servant of the helpers, where it appears that he was expected to assume the lead and direct the work, and did so, that the stack consisted of heavy sheet-iron sections which had to be hoisted to the top of the building by a rope, six to ten

[1]Reported in 123 Pac. 526.

men pulling on it, and that an insecure wall, selected as a fulcrum, gave way under the strain; since the character of the work plainly required supervision, and the master was bound to furnish safe appliances.

SAME—ASSUMPTION OF RISKS. In such a case, a helper pulling on the rope below, does not assume the risk of dangers from the insecure wall, as he could assume, without going on the roof to inspect it, that the appliance was safe.

Appeal from a judgment of the superior court for King county, Gilliam, J., entered July 31, 1911, upon the verdict of a jury rendered in favor of the plaintiff, in an action for injuries sustained by a boiler maker's helper assisting in hoisting a stack. Affirmed.

*Farrell, Kane & Stratton,* for appellants.

*Parker & Brown,* for respondent.

ELLIS, J.—Action to recover damages for personal injuries suffered by the plaintiff while in the employ of the defendants. In October, 1907, and for some time prior thereto, the plaintiff was in the employ of the defendants in their boiler works in the city of Seattle. The defendants, through their general foreman, one Bean, on the day before the accident, sent the plaintiff and two other men to put up on the top of a building, some six or seven stories high, known as the Perry Hotel, in the city of Seattle, a ventilating stack. The stack was made of heavy sheet iron, and in sections which had to be hoisted from the ground to the top of the building, and the sections there put together to form the completed stack.

Of the three men, one, Peter Wezrek, was a boiler maker, the plaintiff and the other man being employed in the capacity of boiler maker's helpers. The evidence tended to show that the man Wezrek took the lead, and to the extent found necessary directed the others in the work. It was necessary at the start to erect upon the roof of the building a derrick or hoist for the purpose of raising the sections from the

ground. All three of the men went upon the roof and discussed what timbers would be necessary, and though Wezrek's memory was to the contrary, the other evidence shows that the plaintiff, in compliance with directions from Wezrek, went below, secured the necessary timbers and attached them to a rope dropped over the side of the building. These timbers were then drawn up by Wezrek and the other man, and these two constructed the hoisting appliance in the following manner. The wall of the building, which was of brick, arose above the roof about three feet. A plank was first placed on top of the brick wall, and a long piece of timber, referred to in evidence as the pole, was rested upon the plank so that one end extended out something over two feet beyond the wall while the inner end extending back about sixteen feet was secured on the roof. From the outer end of this pole, depended the rope and blocks forming the tackle to be used in hoisting the heavy sections of the ventilator. The evidence, though conflicting on this point, we think fairly shows that the plaintiff was not upon the roof after the preliminary visit, nor after Wezrek sent him below to secure the timbers, and did not aid in the actual work upon the roof.

On the day of the accident, when the three men endeavored to hoist a section of the stack by pulling upon the rope, they found the section too heavy for their strength, and telephoned to the shop for more men. These were sent from the shop, and as one of them testified, reported to Wezrek. Certain painters at work on the hotel also assisted, and at the time of the accident the witnesses estimate the number of men pulling on the rope at from seven to ten. The pressure on the wall as the heavy section cleared the ground caused the wall to give way beneath the pole, and some of the bricks fell to the ground, one of them striking the plaintiff upon the head, inflicting the injury complained of.

The accident occurred on October 22, 1907. On November 15 the defendants paid the plaintiff the sum of $152.50 and obtained his signature to a written release. The evi-

dence touching this release is extremely conflicting. The plaintiff returned to work on November 25, and continued to work for about thirteen months, at times working overtime, but it is admitted the work given him was of a lighter character than what he had before been doing. It is fairly established by the evidence that, during all this time, he suffered from severe pains in the head and that a partial paralysis of his right side developed. About thirteen months after the injury, he quit work and underwent an operation whereby a small piece of his skull was removed. When sufficiently recovered from this operation, he again returned to work and continued for three or four months, when he again quit, it is claimed, on account of a return of the pains in his head, continued paralysis and a general weakened condition. The evidence seems conclusive that his injury is permanent. The trial resulted in a verdict for the plaintiff in the sum of $6,500. Defendants' motions for a new trial and for judgment notwithstanding the verdict were overruled, and judgment for that amount was entered, from which the defendants have prosecuted this appeal.

The appellants first contend that the respondent was not entitled to recover because he settled with the appellants and executed a full release of his claim. It is admitted that the respondent signed the release, but he contends that he was in a dazed condition at the time and had no realizing sense of what he was doing. The appellant Jenkins testified that, in response to a telephone message from the respondent's house, some days after the injury, he called there and discussed the matter of settlement with the respondent, his wife and her mother; that the wife suggested the basis of settlement as finally made, and that the respondent concurred in it; that at the time he appeared to be entirely rational and in a normal condition mentally. The wife testified that the question of a release was never suggested, but that the conversation was confined to a payment of wages until the respondent could return to work and the expenses attendant

upon the injury. Afterwards the appellants sent an attorney to secure the release. He made two visits to the Hicks residence. The second visit was on November 15th, a few hours after the respondent's wife had given birth to a child. The settlement was made at that time on the basis of $65.50 for expenses and $85 for loss of wages. The attorney testified that the respondent signed the release, and that he then took it to the wife who signed it as a witness; that the respondent conversed freely and intelligently and fully understood the nature of the paper as did also his wife.

On the other hand, the respondent testified that he had no knowledge of the visit either of Jenkins or of the attorney and no memory of signing the release. His wife testified that she did not know the paper was a release when she witnessed it, but that the attorney informed her that it was merely a receipt for expenses and wages and that it was not necessary for her to read it. The evidence we think establishes beyond doubt that the respondent's skull was fractured by the impact of the brick causing a dent in the skull and pressure upon the brain, and that his mentality has been, to some extent, impaired ever since. The evidence shows that, on the night immediately preceding the settlement, and when the child was born, he was in a highly excited and nervous condition, walking the floor and complaining of intense pain in the head and unable to sleep until an opiate was administered to him; that but a few days before this he had gone down town to consult a physician, and on attempting to return home became dazed and did not know which car to take; that his wife going in search of him found him wandering the streets looking at the lights and in a dazed and incoherent state; that at all times after the injury prior to the settlement and even up to the time of trial, he was extremely nervous and irritable, suffering with almost continual pain in the head, and at times dropping into unconsciousness and stupor.

It is manifest that, if the evidence of the respondent's wit-

nesses is to be believed, he was in no fit condition to understand or appreciate what he was doing when he signed the release. He himself testified that he had no memory of ever seeing the attorney or of signing any paper. The evidence shows that the respondent, a young man twenty-two years of age, was before the injury a man of exceptional intelligence. In view of his condition thereafter, the gross inadequacy of the consideration for the release is some evidence that he did not realize the purport of the paper when he signed it. In connection with the other circumstances, it tended to establish a constructive fraud.

"When the inadequacy of consideration is very gross, fraud will be presumed, for though in such a case there may be no positive evidence, yet, when the inequality is so great as to shock the conscience, the mind cannot resist the inference that the bargain must in some way have been improperly obtained." 6 Am. & Eng. Ency. Law (2d ed.), p. 701. See, also, *Butler v. Haskell*, 4 Des. (S. C.), 651; *Burch v. Smith*, 15 Tex. 219, 65 Am. Dec. 154; *Sanford v. Royal Ins. Co.*, 11 Wash. 653, 40 Pac. 609.

The question as to whether the release was understandingly signed by the respondent was one for the jury upon the evidence, and was submitted under proper instructions. In this we find no error. *Pattison v. Seattle, Renton etc. R. Co.*, 55 Wash. 625, 104 Pac. 825; *Westby v. Washington Brick, Lime & Mfg. Co.*, 40 Wash. 289, 82 Pac. 271.

It is next contended that, if there was any negligence, it was that of respondent's fellow servant for which the master would not be liable. The work was plainly of a character which required supervision. It was the duty of the master to use reasonable care to provide reasonably safe facilities for the work. The respondent and three other men who assisted in the work all testified that the boiler maker Wezrek was foreman of the gang sent by the general foreman, Bean, to do the work and that they acted under his orders and direction. The fact that Wezrek regarded himself as having been placed in charge and as responsible for the work is

amply shown both by his testimony and his actions. He testified as follows:

"Q. Mr. Wezrek, did you or did you not arrange that tackle? A. Why, yes, I arranged part of it. Q. You put it in place did you yourself? A. Well, yes, with the help I had."

And again,

"A. Why, he was there part of the time. I don't know whether he helped me—I know he was there at the last, I know he helped me put ropes on; that is all I can remember. I don't remember, that is, to know whether he was there all the time or not. Three of us was sent up there to do the job. Q. Who sent you up there, Bean? A. Mr. Bean sent me up there. Q. Bean was your foreman? A. Was my foreman, yes. Q. And he sent all three of you out there to do the work? A. Yes. Q. And you all agreed upon the manner in which that work should be done? A. Yes. Q. There was nobody particularly in charge of that work out there, was there? A. Why, I was head man, I was the boiler-maker; they were the helpers; of course I didn't get full charge of it or anything like that, I had to do as the foreman told me. Q. You had to do as the foreman told you? A. Yes. He told me to go out there and put it up, that is all. Q. He told you three men to go out and put it up? A. Yes, sir. Q. So you were not made boss or foreman of this crowd, or anything like that? A. No, I was not made boss. They didn't tell me to take charge or anything of that kind; they told me to do the job, you know."

And yet again,

"Q. And you all three talked about the manner in which you should do the work? A. I just went up there and decided that it would be a good scheme, is all, and put her right up. Q. And it looked safe and sound to you? A. Yes, it did. If it didn't I would not put it up, I don't think. Q. You didn't see any danger with that way of putting it up? A. No. If I had I would not have put it up."

While it is true that in response to leading questions he assented to the statement that he was not made boss, he says of his own accord "they told me to do the job you know."

While it is also true that Bean, the general foreman, denied that Wezrek was foreman, that merely created a conflict of evidence. The question was one for the jury. This is especially true when the character of the work the negligent performance of which resulted in the injury is considered. The very fact that it was the insecure construction of an appliance necessary to any safe performance of the work in hand, made it the duty of the master to supply it or provide competent supervision for its construction. If, as the jury must have found, that duty was delegated to Wezrek, and he, as he says, "just went up there and decided that it would be a good scheme," then his selection of the insecure wall as the fulcrum for the boom to which the rigging was attached was an act for which the master was liable. There is no evidence that the men themselves selected Wezrek as their foreman. The evidence points much more surely to the fact that, whether designated as foreman in explicit terms or not, he was expected by the master to assume the lead and direct the work and that he and the men with him so understood. Under such circumstances, there was negligence if there was a lack of proper superintendence when the character of the work demanded it. *Hall v. Northwest Lum. Co.*, 61 Wash. 351, 112 Pac. 369; *Martin v. Hill*, 66 Wash. 433, 119 Pac. 849. These questions were submitted to the jury under clear and distinct instructions. Its finding is conclusive upon us.

Nor do we find any merit in the contention that the respondent assumed the risk. If Wezrek was entrusted with superintendence of the work, then the respondent had the right to assume, without going upon the roof to inspect it, that the appliance was safely constructed. *Dumas v. Walville Lum. Co.*, 64 Wash. 381, 116 Pac. 1091.

The judgment is affirmed.

DUNBAR, C. J., MOUNT, and FULLERTON, JJ., concur.