### Charles N. Hazelton v. William B. Carolus.

#### Gen. No. 4,753.

1. FRAUD—*latitude of proof allowed.* Where a charge of fraud is made, the greatest liberality is allowed in the method of examination pursued and in the scope of the inquiry.

2. FRAUD—*what evidence competent upon question of, where fraud in connection with a sale is charged.* The acts, conduct and declarations of the parties charged with the fraud both before and after the sale are competent.

3. TENDER—*when not essential to recovery in action for deceit.* Where fraud in the sale of stock is charged, a tender back of the stock is not a pre-requisite to a recovery if fraud and deceit are proven.

Hazelton v. Carolus.

4. MEASURE OF DAMAGES—*in action for fraud and deceit.* In an action for fraud and deceit in inducing a purchase of stock, the measure of damages is the loss which the plaintiff sustained by reason of the alleged fraud and deceit of the defendant.

5. MEASURE OF DAMAGES—*in action for fraud and deceit.* The proper measure of damages for fraud and deceit in inducing a purchase of stock is the difference between the value of the stock as the condition of the company showed it was and what it was had the condition of the company been what the purchaser had been fraudulently induced to believe it was.

Action on the case for deceit. Appeal from the Circuit Court of Whiteside county; the Hon. WILLIAM H. GEST, Judge, presiding. Heard in this court at the October term, 1906. Reversed and remanded. Opinion filed April 10, 1907.

A. A. WOLFERSPERGER and C. L. & C. E. SHELDON, for appellant.

HENRY C. WARD and FRANCIS E. ANDREWS, for appellee.

MR. JUSTICE THOMPSON delivered the opinion of the court.

In April, 1904, the appellee, Dr. Carolus, sold 7,000 shares of the stock of the Eureka Mining, Smelting & Power Company, to appellant, Dr. Hazelton, for $3,750. Within a year after the purchase of the stock, appellant claims, it turned out to be worthless, and brought this suit. On a trial before a jury the verdict was for the defendant. A motion for a new trial was overruled and judgment rendered against the plaintiff for costs, and he appeals.

The form of the action brought by the plaintiff is uncertain. It is not clear whether plaintiff seeks to rescind the contract for fraud and recover back the purchase money or is suing on a promise claimed to be made by defendant to take back the stock if plaintiff should be dissatisfied, or whether the suit is an action to recover for deceit. From the beginning of both counts of the declaration it would appear to be an action in case for deceit, eleven pages of the second

count being devoted to allegations of false and deceitful representations. Each count ends with an averment that the defendant said to the plaintiff that if the stock was not as represented and if the plaintiff became dissatisfied with it, he, the defendant, would take it off his hands; "that the stock was not as represented and he, the plaintiff, was dissatisfied with the purchase and tendered the stock back and demanded the amount paid for the stock; but the defendant refused to pay back to the plaintiff the money paid for said stock, as he agreed, and still refuses to pay the same to the plaintiff," etc. The defendant filed three pleas: the general issue in case; the general issue in assumpsit; and a special plea alleging the stock had a market value in excess of the money paid for the same, and that at the time of the sale it was agreed that plaintiff should at once inform himself in regard to the value, and if after such investigation he was dissatisfied with the stock the defendant would take the same off plaintiff's hands; that plaintiff did afterwards investigate the market value of the stock and was satisfied with the same, and all agreements were cancelled, etc. The court sustained a demurrer to the last two pleas, and the suit was tried as an action in case for deceit.

The record shows that the Eureka Mining, Smelting & Power Company is a corporation organized under the laws of the State of Washington, with a capitalization of two million dollars. It claims to own large and rich copper mining properties on Snake river in the State of Oregon, over fifty miles by the Snake river from the nearest railroad, which is at Lewiston, in the State of Idaho. The distance by the wagon road from the property of the company to Lewiston is over one hundred miles across the mountains. Three of the promoters of the company are Joseph T. Miller and William J. Wilkinson, of Sterling, Illinois, and G. A. Nehrhood, formerly of Sterling, but now of Lewiston, Idaho. Dr. Carolus is a homeopathic physician resid-

ing at Sterling, Whiteside county, and Dr. Hazelton is a physician of the same school, practicing at Morrison, in the same county. On February 14, 1904, the defendant wrote a letter to the plaintiff, stating, amongst other things: "This is a case that should demand your immediate diagnosis, and then I know the prescription will be *aurum, argentum* and *cuprum.* I send you under separate cover a prospectus of the Eureka mines, in which I have already purchased 15,-000 shares and have contracted for more. The proposition is one worthy of a careful investigation by you as a future investment. I have been on the grounds and know they have just what they claim. * * * This is no humbug, the head men are friends of mine and men I have known for years, as this is their home; they are honest and upright; men of integrity and worth, and who will do just as they say. * * * I have on hand some fine ore I brought back from there. I wish you could see it. I know if you will take the time to run out and see the mines, you will do as I have done; it is no prospect any more, *nothing covered,* you can see it for yourself." The prospectus contained the following, among other statements: " (1) The treasury stock is now, as it has been for some time, selling at par, one dollar a share; but that larger dividends may be realized in the near future. * * * (2) We have not only the largest mineral-bearing property ever securing patent of the state in which we are located, but have spent sufficient money upon it to class it among one of the great producers, as soon as our reduction plant, now under point of construction, is completed." * * * "(5) At the time Doctor Munson, who was manager of the United States Mint at Denver for many years, made an examination of the property he found the average value of the ore to exceed fifty dollars per ton, as follows: Copper, 12½ per cent., $31.25; gold, $8.67; silver, $2.46, etc." * * * "(6) We have a great many assays which demonstrate that large bodies of ore may be taken out fully as good

as that procured and assayed by him." * * * "(8) We have the mine end of our property in condition to take out 200 tons of ore per day, which daily tonnage can easily be increased. * * * We have sufficient generators, dynamos and motors on hand with which to operate the first plant. * * * The estimated net earning capacity from our 100-ton reduction plant, taking out copper, gold and silver values only, with copper at 12c. per pound, gives us an average daily earning of $4,107. We base our calculation upon running 320 days out of the year, making a total earning of $1,314,240. The estimated total operating expenses is $114,240, leaving a net earning of $1,200,000" for the year. There is also an enumeration of the percentage of ores in noted copper mines. Calumet, $3.05; Tamarack, $1.61; Butte and Boston, $5.00, and others, closing with "Eureka average assay, $12.50." It contains a statement that "there is absolutely no question as to quality and quantity of our ore, fuel, lumber, etc., nor as to transportation either by boat or road." Dr. Carolus in his letter referred to a letter written by Mrs. Baker, a patient of his, and enclosed it with his letter to Dr. Hazelton. The letter of Mrs. Baker reiterated and enlarged on many of the statements of the prospectus. The proof showed that Dr. Hazelton in his conversation at the time the sale was made reasserted many of the statements of the prospectus regarding the value of the mine, its surroundings, condition and the safety of the investment. It was shown that the stock that was sold to plaintiff belonged to Wilkinson, one of the promoters, and was sold as a special favor to Dr. Hazelton by Carolus at 55 cents on the dollar, less $100 on the 7,000 shares. Hazelton desired to know of whom he was buying the stock and to see the seller, but Carolus would not tell him either who the seller was or let Hazelton go with him to see the seller, giving as a reason that "the party did not want it known that he was hard up." That Carolus did make some promise to

take the stock back as an inducement to Hazelton to buy would seem to be true. Hazelton is corroborated in this statement by a witness Burleigh. This is denied by Carolus and by his daughter, who claims to have heard the conversation from an adjoining room. The special plea filed by Carolus would seem to be conclusive of that fact, although the plea is now claimed to be a dream of his counsel.

Dr. Hazelton and Burleigh both testified that when Dr. Carolus was requested to take the stock back he said he had discovered that the ore from the mine was a low-grade ore of about two per cent., and that the ore which he had told Hazelton assayed twelve and one-half per cent. never came from the Eureka mines, but from some other place. Appellee admitted on the witness stand that there is no transportation from the mine, although the first time he went there by boat. In June, 1904, he had to drive to the mine from Lewiston, and in December, 1904, the boat went half way and the remainder of the way was by road or trail. There was no machinery in the smelter, no dam built, and no proper fuel accessible. It was proved that the stock, with a single exception, had never sold as high as one dollar per share. The weight of the proof showed that the material statements in the prospectus were false; that the stock never had any actual value. In addition to the proved admission of Dr. Carolus concerning the quality of the ore, four practical miners who had examined the properties testified that the ore is low grade, that the mine is worthless, and almost inaccessible, there being no practical transportation, or accessible fuel, and the claims made which would give the stock any value were false.

Appellant attempted to prove the declarations and statements made by Dr. Carolus on January 28, 1905, concerning the conditions he found at the mine in December, 1904, and "of the immense amount of fraud, rascality and deception in the affairs of the company," and also a statement of Dr. Carolus that he

had only got $187 commission for making the sale. This evidence was ruled out upon the motion of appellee. He in his letter had vouched for the honesty and integrity of the head men of this company. When a question of fraud and deceit is the issue, "Courts are a unit in allowing the greatest liberality in the method of examination and in the scope of the inquiry." 6 Encyc. of Ev. 22. We think the acts, conduct and declarations of Dr. Carolus concerning the mine and its surroundings, both preceding and subsequent to the sale, were relevant and competent evidence against him to prove the alleged fraud. As Dr. Carolus claims he was only an agent in making the sale, the amount of commission he received was competent as proving his interest, intent and motive in the transaction at the time of the sale, and it was error to exclude the proof concerning his declarations.

It is insisted by appellee that there could be no recovery in this action because appellant when he tendered the stock back before the beginning of the suit had not indorsed it. This was not necessary. In an action for deceit it is not a pre-requisite to a recovery, if fraud and deceit are proved, that the stock should be tendered back (Smith v. Hoffman, 122 Ill. App. 198), unless such a tender is made material by averments of the declaration. The measure of damages was the loss plaintiff sustained by reason of the alleged fraud and deceit of defendant.

Error is assigned on the refusal of the court to give five instructions asked by the appellant. The first refused instruction is:

"The court instructs the jury: If you believe from the evidence in this case that the defendant, at and before the purchase of the stock in question by the plaintiff from the defendant, made false and fraudulent representations as to the character, quality and condition of the mine or mines claimed to be owned by the Eureka Mining, Smelting & Power Company, and as to the means of transportation of said company, and as to the value of said stock as an investment, and

that the said defendant knew, at the time he made such representations, that the same were false, or that he had reason to believe that the same were false and untrue; and if you further believe from the evidence that the representations so made by said defendant were false and not true, and that the plaintiff relied upon the same and would not otherwise have purchased said stock, and that the plaintiff has been injured or damaged thereby; then, in that case, you should find the issues for the plaintiff."

This instruction correctly stated the law applicable to the case in an action of deceit.

The abstract does not show any instruction given on behalf of appellant. An examination of the record shows that a number of instructions were given on behalf of appellant, some of them fully covering the law, so far as properly stated in the refused instructions, and there was no error in refusing duplicate instructions.

The appellant requested two instructions to be given upon the measure of damages if the issue should be found for him. The first refused instruction upon that question was based upon the theory that the defendant had agreed to take the stock back and refund the purchase money, and that plaintiff was dissatisfied and had tendered the stock back and was entitled to recover the purchase money. This would be the true measure of damages if the pleadings were in proper shape and the case had been tried on that theory, but the declaration and plea were in case. This would also be the proper measure of damages if the proceedings were upon the theory that the plaintiff had rescinded the contract for fraud, but the declaration does not contain appropriate allegations for such a cause of action. At the request of the appellee the jury were instructed that "the measure of damages is the difference, if any is shown by the evidence, between the value of the stock sold to the plaintiff by the defendant at the time of such sale and the price paid for the same." The proper measure of damages in

an action for deceit on the sale of stock is "the difference between the value of the stocks, as the condition of the company issuing it was, and what it would be if the condition of the company had been as the purchaser was fraudulently induced to believe it was." The market price of the stock about the time of the purchase is strong evidence of its value and in the absence of other proof will control.   But where the real pecuniary condition of the company is shown, from which it appears that the stock was worthless, such market price is entitled to no weight upon the question of value.   Antle v. Sexton, 137 Ill. 410; III Sutherland on Damages, 591.

Error is assigned upon some of the instructions given at the request of the defendant, which told the jury the plaintiff could not recover on the promise of defendant to take the stock back.   The plaintiff had all through the case, both in setting the pleadings, in introducing evidence, and in some of his instructions, treated the case as one for deceit and not a suit for breach of contract.   There was no error in giving the instructions on that question.

The motion for a new trial should have been granted because of the error in excluding relevant testimony. For this reason the judgment is reversed and the cause remanded for a new trial.

*Reversed and remanded.*